242 N.J. Super. 457 (1990)
577 A.2d 188
WILLIAM RUPP, AN INFANT BY AND THROUGH HIS GUARDIAN AD LITEM GEORGE RUPP AND BETTY JO RUPP, INDIVIDUALLY, PLAINTIFFS-RESPONDENTS,
v.
BROOKDALE BAPTIST CHURCH, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 5, 1990.
Decided July 12, 1990.
*458 Before Judges MICHELS, R.S. COHEN and BROCHIN.
Virginia T. Shea argued the cause for appellant (Sellar, Richardson, Stuart & Chisholm, attorneys; Virginia T. Shea, of counsel and on the brief).
Katherine M. Lordi argued the cause for respondents.
The opinion of the court was delivered by MICHELS, P.J.A.D.
*459 We granted defendant Brookdale Baptist Church leave to appeal from an order of the Law Division which denied its motion for summary judgment in this action brought by plaintiff William Rupp, an infant by and through his guardian ad litem George Rupp, and plaintiff Betty Jo Rupp, individually, to recover damages for personal injuries sustained by William during his participation in a day camp operated by the Church. The trial court denied the Church summary judgment because it was "not satisfied that the camp's purpose was to further religious education."
The facts are essentially uncontroverted. The Brookdale Baptist Church which is located in Bloomfield, New Jersey, was established in the 1890's and was incorporated in July, 1895. It is a not-for-profit organization, established exclusively for religious, charitable and educational purposes. According to its constitution, the Brookdale Baptist Church was created
to bear united witness to the faith of its members in the whole Bible as the inspired Word of God; to promulgate the Gospel of Jesus Christ and the faith once for all delivered to the saints; to aid in mission work and in the winning of the lost to the Lord Jesus Christ; and to build up its constituency in the most holy faith.
In 1987, the Brookdale Baptist Church organized a day camp program for grade school children called Adventure Day Camp. The purpose of the program was to integrate biblical truth into the lives of the children through formal teaching and informal activities such as crafts and games. As the camp handbook states:
The ultimate goal of Adventure Day Camp is the integration of Bible truth into the lives of campers  Matthew 28:19-20 (discipling) and II Timothy 3:17 ("thoroughly furnished unto all good works"). Each week we design activities for both salvation and growth spiritually, emotionally and socially.
The approach is two-pronged with both formal and informal teaching. While we believe both of these are Biblical, the natural setting and extended time from 8:30 AM  12:30 PM, Monday, Tuesday, Wednesday and 8:30 AM  3:30 PM on Thursday and Friday, make the informal teaching model most advantageous.
By formal teaching we mean the proclaiming of God's Word as we are commanded to do in many places in Scripture, such as Colossians 1:28-29. This *460 is done twice daily, once during adventure story time and once during adventure memory time.
Informal teaching is the talking while living that Moses speaks of in Deuteronomy 6:6-9. In fact, this is one of the only places in all of Scripture where we are told the "how" of teaching children God's truth. This then is done all day long by modeling and talking God's Word as it would shed light on what is happening.
We operate a vertical schedule, featuring different days at various public parks and beaches:
Monday  Group Games
Tuesday  Crafts
Wednesday  Group Games
Thursday  Van Saun Park
Friday  Swim Day
A reading of the handbook and a letter sent to the parents of children involved, illustrates that the day camp program was designed to carry out the Church's goals. The program, which was open to all students in grades one through five, was organized into four one week sessions beginning on June 29. The camp hours were 8:30 to 12:30 on Monday, Tuesday and Wednesday and 8:30 to 3:30 on Thursday and Friday. Campers were charged a nominal fee of $15 per week for the program. These monies, however, were used to help meet the costs of the program and were not turned over to the Church treasury.
William registered for the Adventure Day Camp and attended the program during the week of June 29, 1987 and on July 6, 1987. William's parents had registered him in the program to participate in the crafts and activities and not for religious training. According to plaintiffs, there were no scheduled religious studies or activities at the camp except for a few minutes of prayer. Plaintiffs are not members of the Brookdale Baptist Church and aside from William's participation in the camp, had no other contact with the Church. On July 6, 1987, William and a group of campers were playing a game in a park across the street from the Church. During the course of the game, William sustained injuries to his elbow. Following his injury, William did not return to the camp.
*461 The Brookdale Baptist Church contends that as a religious, nonprofit organization organized exclusively for religious, charitable and educational purposes it is entitled to the protection of the charitable immunity statute. N.J.S.A. 2A:53A-7 et seq. We agree.
The principle of charitable immunity was deeply rooted in the common law of New Jersey. The principle is premised on the fact that charitable associations are created to pursue philanthropic goals and the accomplishment of those goals would be hampered if they were to pay tort judgments in cases similar to this matter. As one author has noted, three justifications are advanced in support of the doctrine:
The first is that trust funds which are devoted to charitable objects should not be diverted from those objects by the payment of tort claims. The second is premised on an alleged waiver by the injured party not to pursue a tort claim. The third reflects the alleged inapplicability of the doctrine of respondeat superior to an eleemosynary organization.
The inviolability of the trust funds' corpus represents the most viable defense of the charitable immunity doctrine. As noted over a century ago in Heriot, a person who makes a charitable contribution expects his donation to further the goals of the organization, and not to be used to satisfy lawsuits which bear no direct relationship to those goals. Utilizing this analysis, the concept of suing the negligent members, but not the charitable entity may be justified. [Bottari, The Charitable Immunity Act, 5 Seton Hall Legis J. 61, 63-64 (1980)].
As this century progressed, however, the courts began to view charitable immunity with disfavor. The principle that the doctrine was socially beneficial was replaced with the belief that it promoted injustice and irresponsibility. Acting upon these beliefs, the New Jersey Supreme Court abolished the doctrine of charitable immunity in 1958. Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29, 141 A.2d 276 (1958); Dalton v. St. Luke's Catholic Church, 27 N.J. 22, 141 A.2d 273 (1958); Benton v. Y.M.C.A., 27 N.J. 67, 141 A.2d 298 (1958). As the Court wrote in Collopy:
It may perhaps be that when D'Amato [v. Orange Memorial Hospital, 101 N.J.L. 61, 127 A. 340 (E. & A. 1925)] was rendered in 1925 it accurately represented the then prevailing notions of public policy. But times and circumstances have changed and we do not believe that it faithfully represents current *462 notions of rightness and fairness. Due care is to be expected of all, and when an organization's negligent conduct injures another there should, in all justice and equity, be a basis for recovery without regard to whether the defendant is a private charity.
* * * * * * * *
The primary function of the law is justice and when a principle of the law no longer serves justice it should be discarded; here the law was embodied not in any controlling statute but in a judicial principle of the law of torts; it had no sound English common law antecedents and found its way into American law through a misconception; it runs counter to widespread principles which fairly impose liability on those who wrongfully and negligently injure others; it operates harshly and disregards modern concepts of justice and fair dealing; it has been roundly and soundly condemned here and elsewhere and the time has come for its elimination by the very branch of government which brought it into our system. [Collopy v. Newark Eye and Ear Infirmary, supra, 27 N.J. at 39, 47-48, 141 A.2d 276].
Despite the Court's decision that charitable immunity was outdated and unjust, the Legislature immediately passed N.J.S.A. 2A:53A-7 et seq. to overrule the Collopy trilogy. N.J.S.A. 2A:53A-7, the focal point of the statute and the provision in issue here, provides in full:
No nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association; but nothing herein contained shall be deemed to exempt the said agent or servant individually from their liability for any such negligence.
Likewise, N.J.S.A. 2A:53A-10 provides:
This act shall be deemed to be remedial and shall be liberally construed so as to afford immunity to the said corporations, societies and associations from liability as provided herein in furtherance of the public policy for the protection of nonprofit corporations, societies and associations organized for religious, charitable, educational or hospital purposes.
Litigation concerning the statute has primarily focused on two issues: (1) whether the organization at issue is a charitable association within the act and (2) whether the plaintiff is a *463 beneficiary, to whatever degree, of the works of such nonprofit corporation. These are precisely the issues involved in this appeal.
It is uncontroverted that Brookdale Baptist Church is a nonprofit corporation organized exclusively for religious, charitable and educational purposes. As such it is encompassed within the protection afforded by the statute.
The more difficult question is whether William was a beneficiary to whatever degree of the works of Brookdale Baptist Church and, as a result, should be precluded from recovery. In our view, William was a beneficiary of the Church within the meaning of the immunity act and, therefore, this action is not sustainable. As was set forth in Anasiewicz v. Sacred Heart Church, 74 N.J. Super. 532, 536, 181 A.2d 787 (App.Div.), certif. den., 38 N.J. 305, 184 A.2d 419 (1962), beneficiary status does "not depend upon a showing that the claimant personally received a benefit from the works of the charity." Rather the test is "whether the institution pleading the immunity, at the time in question was engaged in the performance of the charitable objectives it was organized to advance." Id. Applying these principles, we immunized the defendant church from liability for injuries sustained by a nonmember who merely attended a wedding ceremony at the church. We reasoned:
The plaintiffs attended the ceremony by their own choice, and so by their volition were concerned in, related to, and within the benefactions of the church. Whether they actually benefited spiritually by their attendance is of no moment. Such a test, wholly subjective, and depending upon many debatable factors which transcend legal concepts, is not within the ken of the law. While we do not disregard the fact that what took place in their presence was designed to further the high purposes of sanctifying a marriage in accordance with religious tenets which they embrace, the controlling fact is that in providing the situs of the ceremony the church contributed to the preservation of moral or sociological concepts held by the community generally. The "works" of the institution were, therefore, a "benevolence" shared in common by plaintiffs and all members of the community, present or absent, and without regard to their religious beliefs or persuasions. This, or a comparable intrinsically charitable function, was absent in all cases in which immunity was previously denied. [Id. at 537-538, 181 A.2d 787].
*464 In Gray v. St. Cecilia's School, 217 N.J. Super. 492, 526 A.2d 264 (App.Div. 1987), the Anasiewicz rationale was applied to bar recovery by a mother who injured herself while picking up her son at the parochial school he attended. In declaring the child's mother to be a beneficiary of the church's eleemosynary activities, we wrote:
Legislative intent to interpret broadly the response to this consideration is shown by the modifying words, "to whatever degree" used in the statute after the word "beneficiary" and by the description of a person not subject to immunity as ".. . one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association ..." N.J.S.A. 2A:53A-7.
Although Gray did not come to St. Cecilia's to pray on the date of the accident, or even to discuss her child's educational progress or to view a school play, her presence was clearly incident to accomplishment of a purpose of her own, to insure that her child should receive the benefits of a Catholic school education, rather than the secular education otherwise provided by government. In this regard, Gray, a Catholic, was not "unconcerned in" or "unrelated to" or "outside" the benefaction of the school and the diocese which provided the location and means to accomplish this purpose. [Id. at 495, 526 A.2d 264].
See Schultz v. Roman Catholic Archdiocese, 95 N.J. 530, 472 A.2d 531 (1984); Bixenman v. Christ Episcopal Church Parish House, 166 N.J. Super. 148, 399 A.2d 312 (App.Div. 1979).
It is clear that William was a beneficiary to whatever degree of Brookdale Baptist Church because at the time of his injury the Church, through the Adventure Day Camp, was actively engaged in the pursuit of religious, charitable and educational goals. It is also abundantly clear that by sponsoring the Adventure Day Camp, the Church was bearing witness to its beliefs and promulgating the Bible, both religious goals. As the camp handbook makes clear, religious instruction was the camp's fundamental purpose. The handbook states that "[t]he ultimate goal of Adventure Day Camp is the integration of Bible truth into the lives of campers...." The camp director made this clear to the parents involved by writing to them that by participating in the camp, their children would learn the "Word of God." To carry out these religious goals, prayers were held at the camp. In sum, the camp was intended to be a *465 religious experience and an extension of the Church's religious beliefs and teachings.
The fact that plaintiffs did not send William to the camp for religious training and that they claim that they were unaware of the camp's religious goals is irrelevant. Contrary to plaintiffs' argument, their subjective understandings and intentions are unimportant in determining beneficiary status. Furthermore, plaintiffs' claim that no religious activities were conducted at the camp is erroneous. Plaintiffs concede that prayers were held. Even if no other religious activities were performed, the fact that prayers were said regularly is enough to make the camp a religious endeavor.
Additionally, the camp qualifies as an educational and charitable pursuit. We have broadly interpreted the term "educational" when construing this statute, and have not limited the word to scholastic activities. Pomeroy v. Little League Baseball, 142 N.J. Super. 471, 474, 362 A.2d 39 (App.Div. 1976). Here, the record establishes that crafts and games were a daily part of camp life. Such foster sportsmanship, honesty and creativity and, hence, are educational for purposes of the act.
Moreover, the camp was a charitable undertaking. Even though campers were charged a fee of $15 a week to attend, the fees were used to help cover the expenses of the program. The camp was exclusively a not-for-profit operation. A qualifying organization does not lose its statutory immunity merely because it charges money for its services. See, e.g., Schultz v. Roman Catholic Archdiocese, supra; Gray v. St. Cecilia's School, supra. Only in those situations where the organization makes a profit or collects fees for services totally unrelated to its charitable pursuits, does the collection of fees bar statutory protection. See, e.g., Kasten v. Y.M.C.A., 173 N.J. Super. 1, 412 A.2d 1346 (App.Div. 1980); Book v. Aguth Achim Anchai, 101 N.J. Super. 559, 245 A.2d 51 (App.Div. 1968).
Finally, William attended and participated in the camp and was, thus, a recipient of its benefactions. As the record reveals, *466 William had registered for and attended the first week of the camp. He was injured on Monday of the following week while playing a game with other campers in a park across from the Church. Considering how broadly we have previously construed the phrase "beneficiary to whatever degree," it is hard to imagine how William could not be considered a recipient of the Church's philanthropy.
Accordingly, the order under review is reversed and summary judgment is entered in favor of Brookdale Baptist Church.