243 N.J. Super. 317 (1990)
579 A.2d 360
HAZEL PARKER, PLAINTIFF-APPELLANT,
v.
ST. STEPHEN'S URBAN DEVELOPMENT CORPORATION, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 5, 1990.
Decided August 24, 1990.
*319 Before Judges PRESSLER, LONG and GRUCCIO.
Patricia A. Connelly argued the cause for appellant (Shebell & Schibell, attorneys for appellant; Peter Shebell, Jr., on the brief).
Thomas Frascella argued the cause for respondent (Hill Wallack & Masanoff, attorneys for respondent; Thomas P. Frascella, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
In 1988, plaintiff Hazel Parker filed a complaint against defendant St. Stephen's Urban Development Corp., Inc., alleging that she had sustained injuries in a fall on a sidewalk at Stephen Manor, an Asbury Park apartment complex owned and operated by defendant. The trial judge granted defendant's motion for summary judgment and dismissed plaintiff's complaint on the ground that it was barred by the Charitable Immunity Act. N.J.S.A. 2A:53A-7. Plaintiff appeals. We reverse.
The facts in the case are relatively straightforward. In June 1968, the governing body of St. Stephen's A.M.E. Zion Church of Asbury Park determined "to serve as a sponsoring organization to work in conjunction with other agencies and particularly with the Federal Housing Authority," and "to help fill an immediate need for respectable housing" in Asbury Park. Accordingly, it created defendant, a nonprofit corporation, pursuant to the provisions of Title 15 of the New Jersey statutes. As set forth in its certificate of incorporation, defendant's goals include working for the "health, welfare and morals of the community" and assisting low and moderate income persons to obtain housing. Among defendant's by-laws, the following corporate purposes were set forth:
a. To undertake any activity or do anything specifically or inferentially permitted under any Act of the United States or the State of New Jersey, specifically *320 including, but not limited to anything permitted or authorized directly or indirectly under Sections 221(d) and/or 236 of the National Housing Act.
b. To immediately undertake the building of a low to moderate income housing development in Asbury Park Urban Renewal Area to provide decent and standard housing for the local community.
* * * * * * * *
e. To solicit, receive, and hold money and other property, real or personal, whether the same be acquired by gift, devise, bequest, or otherwise, and to make such disbursements thereof from time to time as may be determined to be in the best interests of the realization of the objectives of the National Housing Act as it applies to Stephen Manor and other objectives of this Corporation.
Because defendant's incorporation conformed in every respect with the requirements of Section 236 of the National Housing Act (12 U.S.C.A. § 1701 et seq.), it qualified for an arrangement with the United States Department of Housing and Urban Development (HUD) pursuant to which HUD agreed to make mortgage interest reduction payments and provide mortgage insurance on a housing complex which defendant proposed to construct.
With the federal funding in place, in 1971 defendant constructed Stephen Manor, an eight-building apartment complex containing one, two and three-bedroom apartments. As the owner of a multi-family housing project receiving mortgage insurance and interest reduction payments from HUD, defendant also qualified for federal rent supplement payments. 24 C.F.R. § 215.15 (1971). This program requires that individuals who fall into HUD's federal preference categories be given the first opportunity to rent an apartment at Stephen Manor. (All tenants at Stephen Manor fall into one of the federal preference categories.) The program contemplates that the income from all apartments will cover the total expenses of a project including all operational costs, salaries[1], taxes and the portion of the mortgage not paid under Section 236. That total figure is *321 prorated among the apartments to establish the "basic rent" for each unit. The actual rent paid by tenants is determined by an income formula including certain authorized deductions not here relevant. Under the formula, the rent paid is equal to 30 percent of a tenant's net monthly income. The difference between the rent actually paid by each tenant and the basic rent assigned to the unit is covered by a HUD rental subsidy. Approximately 60 percent of the tenants at Stephen Manor receive HUD subsidies. The remaining tenants, whose net monthly income is sufficient, pay the basic rent or more, up to a predetermined market rent. Any amount paid in excess of the base rent by tenants who do not receive HUD subsidies is used to reimburse HUD. 24 C.F.R. § 236.60 (1971); 12 U.S.C.A. § 1715z-1(g). Defendant's operation of Stephen Manor is governed entirely by HUD regulations and is supported by a combination of federal moneys and tenant rental payments. Defendant does not engage in private fund-raising activities of any kind.
Plaintiff became a resident of Stephen Manor in September 1986. On January 17, 1987, she tripped and fell on a sidewalk within the complex, resulting in injuries and medical expenses of approximately $1,000. This action followed.
The doctrine of charitable immunity is rooted in English common law. Holliday v. St. Leonard, Shoreditch, 11 C.B. (N.S.) 192, 142 Eng.Rep. 769 (1861); The Foeffees of Heriot's Hospital v. Ross, 8 Eng.Rep. 1508 (1846); Duncan v. Findlater, 7 Eng.Rep. 934 (1839). The original point of the doctrine was to avoid diverting charitable trust funds to non-charitable purposes in order to live up to the reasonable expectations of the benefactor. In 1876, in a case of first impression in the United States, the Supreme Judicial Court of Massachusetts cited Holliday v. St. Leonard, Shoreditch and declared the doctrine of charitable immunity viable in the New World. McDonald v. Massachusetts General Hospital, 120 Mass. 432 (Sup.Jud.Ct. 1876); Bottari, "The Charitable Immunity Act", 5 Seton Hall Leg.J. 61, 62 (1980). A number of other jurisdictions, *322 including New Jersey, in the case of D'Amato v. Orange Memorial Hosp., 101 N.J.L. 61, 127 A. 340 (E. & A. 1925), followed suit.[2] In 1942, Judge (later Justice) Rutledge observed that the Massachusetts decision in McDonald, from which all of the other American cases approving charitable immunity had taken their cue, had been based upon a principle of English common law which had since been overruled. President & Directors of Georgetown College v. Hughes, 130 F.2d 810 (D.C. Cir.1942). A series of jurisdictions then disclaimed the doctrine, "vigorously" according to one commentator. Bottari, supra, at 62.[3] On April 28, 1958, the New Jersey Supreme Court declared that charitable immunity no longer comported with present day concepts of right, justice and morality, and abolished the doctrine:
The primary function of the law is justice and when a principle of law no longer serves justice, it should be discarded; here the law was embodied not in any controlling statute, but in a judicial principle of the law of torts; it had no sound English common law antecedents and found its way into American law through a misconception; it runs counter to widespread principles which fairly impose liability on those who wrongfully and negligently injure others; it *323 operates harshly and disregards modern concepts of justice and fair dealing; it has been roundly and soundly condemned here and elsewhere and the time has come for its elimination by the very branch of government which brought it into our system. [Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29, 47-48, 141 A.2d 276 (1958).]
See also Benton v. Y.M.C.A, 27 N.J. 67, 141 A.2d 298 (1958); Dalton v. St. Luke's Catholic Church, 27 N.J. 22, 141 A.2d 273 (1958).
Within a week after these decisions were announced, bills were introduced in the Legislature "to provide immunity for all nonprofit corporations organized for religious, charitable, educational, or hospital purposes from negligence suits brought by any ... beneficiary...." Schultz v. Roman Catholic Archdiocese of Newark, 95 N.J. 530, 536-537, 472 A.2d 531 (1984). On July 22, 1958, the Legislature revived charitable immunity by enacting L. 1958, c. 131. The present statute (N.J.S.A. 2A:53A-7 to -11) was enacted in 1959. It is identical to the 1958 statute, differing only in the absence of a fixed expiration date. Schultz, 95 N.J. at 537, 472 A.2d 531. It provides:
No nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association; but nothing herein contained shall be deemed to exempt the said agent or servant individually from their liability for any such negligence. [N.J.S.A. 2A:53A-7.]
According to Anasiewicz v. Sacred Heart Church, 74 N.J. Super. 532, 535-536, 181 A.2d 787 (App.Div. 1962), certif. den. 38 N.J. 305, 184 A.2d 419 (1962), the effect of this statute was to reinstate the common law doctrine as it existed prior to its demise at the hands of the 1958 trilogy of Benton, Collopy and Dalton:
That the Legislature did not intend to expand, modify or alter in any way the span of the pre-existing immunity seems apparent from the statute.... Significantly, *324 the verbiage employed closely parallels the cases in which the immunity rule was enunciated.
* * * * * * * *
[T]he Legislature intended the language of the act to be construed in light of stare decisis to the end that status quo be preserved during the life of the statute.
Litigation concerning the statute has generally focused on two issues: (1) whether the organization is a charitable association and (2) whether the plaintiff is a "beneficiary" of its works. Rupp v. Brookdale Baptist Church, 242 N.J. Super. 457, 462, 577 A.2d 188 (App.Div. 1990). Here it is conceded that plaintiff, who was living at Stephen Manor, was a beneficiary of defendant when she was injured. See Brown v. St. Venantius School, 111 N.J. 325, 544 A.2d 842 (1988) (reaffirming that the Charitable Immunity Act does not insulate charitable organizations from tort liability to nonbeneficiaries). The sole issue is whether defendant is an entity "organized exclusively for ... charitable ... purposes" within the meaning of N.J.S.A. 2A:53A-7. We think not.
In reaching this decision, we are mindful of the fact that defendant is a nonprofit corporation with § 501(c)(3) status under the Internal Revenue Code and that through its operation of Stephen Manor, it is performing a social service. However, none of these factors is dispositive of defendant's status for immunity purposes. Construing language in N.J.S.A. 54:4-3.6 nearly identical to that at issue here, the Supreme Court held that "[n]onprofit status ... cannot be equated with charitableness. Rather, it is but one factor which merits consideration in the determination whether property is being used for charitable purposes." Presbyterian Homes v. Division of Tax Appeals, 55 N.J. 275, 286, 261 A.2d 143 (1970). Likewise, as § 501(c)(3) status "has no relation to state law governing property tax exemption" (Id. at 286 n. 3, 261 A.2d 143), it is irrelevant to a charitable immunity analysis.
Further, the performance of useful service does not per se compel the corollary that a corporation meets the standard for *325 charitable immunity. Jacobs v. North Jersey Blood Center, 172 N.J. Super. 159, 411 A.2d 210 (Law Div. 1979). What is required is an examination of the entity seeking to clothe itself in the veil of charitable immunity to discover its aims, its origins, and its method of operation in order to determine whether its dominant motive is charity or some other form of enterprise. When such an examination is undertaken in this case, the conclusion that defendant is not "organized exclusively for ... charitable ... purposes" is inevitable.
As this record reveals, St. Stephen's A.M.E. Zion Church did not undertake to create low and moderate income housing in Asbury Park through its own efforts either by the dedication of church funds or the establishment of a program of charitable solicitation. On the contrary, as it was entitled to do by law, the Church organized defendant as a nonprofit corporation in scrupulous conformity with the provisions of the National Housing Act. By these actions, the Church merely created a conduit for federal mortgage money and for federal rent subsidies. 24 C.F.R. § 236 (1971); 24 C.F.R. § 215 (1971). Together with tenant rent payments, these two federal programs are intended to pay all of the costs of Stephen Manor so that it will "break even."[4] While it is true that defendant's board is unpaid, this is nothing more than the quid pro quo for federal funding under Section 236. It is not service to the state without hope or expectation of remuneration for the service thus performed. Carteret Academy v. State Board of Taxes & Assessments, 102 N.J.L. 525, 133 A. 886 (Sup.Ct. 1926), aff'd, *326 104 N.J.L. 165, 138 A. 919 (E. & A. 1927). Indeed, by the very nature of its operation, defendant contravenes one of the footings of charitable status  undertaking acts by which the government is relieved pro tanto from a burden it would otherwise have to perform. Presbyterian Homes, 55 N.J. at 285, 261 A.2d 143. It is the government which pays defendant's mortgage interest, supplies mortgage insurance, and subsidizes the tenants sufficient to meet its operating expenses, including the remaining mortgage payments. Defendant was not created to lessen the burden on government but to obtain as much funding from the government as possible and to operate the project exclusively with that funding. As such, it is no more entitled to charitable immunity than the government itself.
Equally important is the absence from defendant's operation of fund-raising activities and charitable contributions. As far as our research reveals, no New Jersey case has ever applied the immunity statute in circumstances such as these. Private charitable contributions have been involved at least in part in every case in which immunity has been conferred. See, e.g., Heffelfinger v. Town of Morristown, 209 N.J. Super. 380, 387, 507 A.2d 761 (Law Div. 1985); Hauser v. Y.M.C.A., 91 N.J. Super. 172, 177-178, 219 A.2d 532 (Law Div. 1966); Gould v. Theresa Grotta Center, 83 N.J. Super. 169, 171-172, 199 A.2d 74 (Law Div. 1964), aff'd, 89 N.J. Super. 253, 214 A.2d 537 (App.Div. 1965). This is understandable in light of the fact that the essence of the public policy favoring charitable immunity is the preservation of private charitable contributions for their designated purposes.[5] Thus, in Winters v. City of Jersey City, 120 N.J. Super. 129, 293 A.2d 431 (App.Div. 1972), mod. on dissent, 63 N.J. 7, 304 A.2d 196 (1973), where the issue was *327 whether the limitations of the Charitable Immunity Act applied to a nonprofit hospital owned and operated by a municipal corporation, Judge Lynch, whose views were subsequently adopted by the Supreme Court, reaffirmed that the purpose behind charitable immunity was "mainly to protect the trust funds of such charities from serious dissipation ... and to avoid diversion of their benefactors' contributions from the purpose for which they were made." Winters, 120 N.J. Super. at 144-145, 293 A.2d 431 (citations omitted). See Tramutola v. Bortone, 63 N.J. 9, 18, 304 A.2d 197 (1973). More particularly, he defined an entity entitled to immunity as follows:
The words describing those organizations upon which the statute confers either total or limited immunity ("nonprofit corporation," etc.) have developed an established connotation in our law, i.e., a private charity which depends on charitable contributions and whose funds are held in trust solely for the purpose of the charity. The statutory language is derived directly from the cases which conferred immunity upon private charities at common law. [Id. at 138, 293 A.2d 431 (emphasis added).]
Defendant clearly falls outside the scope of this definition. No benefactor whose charitable contributions require protection exists in this case. Defendant is not a private charity which depends for its support on charitable contributions but is rather the qusi-public sponsor of a federally funded housing project. DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428, 442, 267 A.2d 31 (1970).
This is not to suggest that defendant's activities are not salutary or that its operation with federal funds deserves our disapprobation. Nor is it to suggest that an actual charity which receives a measure of support from the government would be prohibited from claiming immunity. See Gould v. Theresa Grotta Center, supra. The inquiry in each case should focus on the essence of the entity itself. If a nonprofit corporation is performing a charitable service and is essentially supported through charitable contributions, the fact that it happens to receive some government support would not alter its nature as a charity for immunity purposes. On the contrary, where, as here, an entity is expressly conceived, created *328 and operated to serve purely as a conduit for federal funds in strict conformity with federal regulations, its denomination as a charity for immunity purposes is incorrect, notwithstanding its benevolent aims. Under the circumstances, application of the legislative policy insulating a wrongdoer from liability to an innocent victim which is embodied in the Charitable Immunity Act was unwarranted.
Reversed.
NOTES
[1] The National Housing Act prohibits defendant's Board of Directors from receiving reimbursement. However, no such prohibition applies to the employees of Stephen Manor who are in charge of the day-to-day operations of the complex and who are salaried.
[2] Perry v. House of Refuge, 63 Md. 20 (1885); Tomas v. German General Benevolent Society, 168 Cal. 183, 141 P. 1186 (1914); Basabo v. Salvation Army, 35 R.I. 22, 85 A. 120 (1912); Burdell v. St. Luke's Hosp., 37 Cal. App. 310, 173 P. 1008 (1918); Phoenix Assurance Co. Ltd. v. Salvation Army, 83 Cal. App. 455, 256 P. 1106 (1927).
[3] Bing v. Thunig, 2 N.Y.S.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (Ct.App. 1957); Avellone v. St. John's Hosp., 165 Ohio St. 467, 135 N.E.2d 410 (Sup.Ct. 1956); Wheat v. Idaho Falls Latter Day Saints Hosp., 78 Idaho 60, 297 P.2d 1041 (Sup.Ct. 1956); Noel v. Menninger Foundation, 175 Kan. 751, 267 P.2d 934 (Sup.Ct. 1954); Pierce v. Yakima Valley Memorial Hosp. Ass'n, 43 Wash.2d 162, 260 P.2d 765 (Sup.Ct. 1953); St. Luke's Hosp. Ass'n v. Long, 125 Colo. 25, 240 P.2d 917, 31 A.L.R.2d 1120 (Sup.Ct. 1952); Moats v. Sisters of Charity of Providence, 13 Alaska 546 (Dist.Ct. 1952); Durney v. St. Francis Hosp., 7 Terry 350, 46 Del. 350, 83 A.2d 753 (Sup.Ct. 1951); Ray v. Tuscon Medical Center, 72 Ariz. 22, 230 P.2d 220 (Sup.Ct. 1951); Malloy v. Fong, 37 Cal.2d 356, 232 P.2d 241 (Sup.Ct. 1951); Haynes v. Presbyterian Hosp. Ass'n, 241 Iowa 1269, 45 N.W.2d 151 (Sup.Ct. 1950); Foster v. Roman Catholic Diocese of Vermont, 116 Vt. 124, 70 A.2d 230 (Sup.Ct. 1950); Tavarez v. San Juan Lodge No. 972, 63 P.R.R. 681 (1948); Rickbeil v. Grafton Deaconess Hosp., 74 N.D. 525, 23 N.W.2d 247 (Sup.Ct. 1946).
[4] In its brief, defendant asserts that it has "acquired operational debt in excess of $340,000 in the day to day operation" of Stephen Manor. This figure came from defendant's accountant who testified at the hearing before the trial judge. However, the accountant also stated that the numbers reflected on defendant's books included "depreciation" and were "strictly accounting." This makes sense in light of the federal scheme which requires the income of the project to meet its expenses and renders the likelihood of an actual substantial operational debt implausible. Indeed, when questioned about the alleged debt at oral argument, defendant's counsel candidly replied that it existed "on paper."
[5] Although cases and commentators have identified other possible underpinnings for charitable immunity, the charitable trust theory is the public policy undergirding New Jersey law. Collopy, 27 N.J. at 54-55, 141 A.2d 276 (Heher, J., dissenting).