888 A.2d 433

ALFRED TONELLI, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF VIRGINIA T. TONELLI, DECEASED, PLAINTIFF–RESPONDENT, v. BOARD OF EDUCATION OF THE TOWNSHIP OF WYCKOFF, NEW JERSEY, DEFENDANT–APPELLANT, AND THE TOWNSHIP OF WYCKOFF, NEW JERSEY, DEFENDANT.

Argued September 28, 2005—Decided December 28, 2005.

*Jeffrey L. Shanaberger* argued the cause for appellant (*Hill Wallack,* attorneys; *Mr. Shanaberger* and *Marilyn S. Silvia,* on the briefs).

*Donald A. Kessler* argued the cause for respondent (*Schwartz Simon Edelstein Celso & Kessler,* attorneys).

*Nicholas F. Pellitta* submitted a brief on behalf of *amicus curiae,* New Jersey Defense Association (*Norris, McLaughlin & Marcus,* attorneys).

Justice LONG delivered the opinion of the Court.

On this appeal, we are called upon to determine whether, in addition to the immunities provided in the Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, a governmental entity—in this case a public school board—enjoys the benefits of the Charitable Immunity Act. *N.J.S.A.* 2A:53A–7 to –11. The trial judge answered that question in the affirmative and the Appellate Division reversed. We agree with the appellate panel and reaffirm our holding in

*Winters v. Jersey City,* 63 *N.J.* 7, 8, 304 *A.*2d 196 (1973), that charitable immunity has no applicability to a governmental entity funded exclusively by the public and rendering services to which citizens are entitled as of right.

I

On March 24, 2002, then 79–year–old Virginia Tonelli and her husband, plaintiff Alfred Tonelli, went to the Lincoln School in Wyckoff to watch their granddaughter play soccer for a local club, the Wyckoff Torpedoes Soccer Club, Inc. (TSC). Lincoln School is a public school "owned and controlled" by defendant Wyckoff Board of Education (Board), a public entity. The Board has adopted a policy that permits non-profit private groups, like TSC, for a nominal fee, to make "full and proper use of the various school plants and facilities to meet the needs of the community." Under that policy, the Board allowed TSC to use Lincoln School's soccer field on the day in question.

Following the soccer game, at about 2:00 p.m., the Tonellis headed toward their car. As they were walking through the Lincoln School parking lot, Mrs. Tonelli tripped over a speed bump and fell, severely fracturing her hip. As a result of complications from her injuries, Mrs. Tonelli died six weeks later.

In September 2002, Alfred Tonelli, as *Administrator ad Prosequendum* of his wife's estate, sued the Board for negligently creating and maintaining the speed bump. The Board's answer asserted that, as a non-profit entity organized exclusively for educational purposes, the Charitable Immunity Act exempted it from liability.

Both parties moved for partial summary judgment on the issue of whether the Board was entitled to immunity under the Act. Tonelli relied on our decision in *Winters,* and on *Hamel v. State,* 321 *N.J.Super.* 67, 728 *A.*2d 264 (App.Div.1999), and *Gerber v. Springfield Bd. of Educ.,* 328 *N.J.Super.* 24, 744 *A.*2d 670 (App. Div.2000), Appellate Division decisions that held that local boards of education are not entitled to the protection of the Act. The

Board countered that our recent decisions in *O'Connell v. State,* 171 *N.J.* 484, 795 *A.*2d 857 (2002), and *Ryan v. Holy Trinity Evangelical Lutheran Church,* 175 *N.J.* 333, 815 *A.*2d 419 (2003), overruled those prior opinions. The trial judge agreed with the Board and Tonelli appealed.

The Appellate Division reversed, concluding that the Legislature did not intend the Charitable Immunity Act to insulate purely public entities, such as public school boards, from liability. *Tonelli v. Bd. of Educ. of Twp. of Wyckoff,* 373 *N.J.Super.* 421, 422, 862 *A.*2d 60 (App.Div.2004). We granted the Board's petition for certification, 183 *N.J.* 215, 871 *A.*2d 92 (2005), along with the application of the New Jersey Defense Association to appear as amicus curiae.

## II

As might be anticipated, the parties' arguments are rooted in the dueling opinions of the trial judge and Appellate Division. The Board contends that because it satisfies the literal language of the Act it is entitled to immunity, and that the Appellate Division's contrary conclusion confounds our recent decisions in *O'Connell* and *Ryan.* Amicus, New Jersey Defense Association supports that view, and argues that financial considerations warrant insulating Boards from liability.

Tonelli counters that the Legislature never intended charitable immunity to be available to instrumentalities of the state, that affording such immunity to public school boards would violate the legislative intent that animates charitable immunity and that neither *O'Connell* nor *Ryan* compels a contrary conclusion.

## III

First recognized in this country nearly 150 years ago, "[t]he doctrine of charitable immunity is rooted in English common law." *Parker v. St. Stephen's Urban Dev. Corp., Inc.,* 243 *N.J.Super.* 317, 321, 579 *A.*2d 360 (App.Div.1990) (citations omitted); *see also*

*Restatement (Second) of Torts* § 895E (1979). The original rationale stated for immunizing charities from tort liability was preventing the diversion of "charitable trust funds to non-charitable purposes in order to live up to the reasonable expectations of the benefactor." *Parker, supra,* 243 *N.J.Super.* at 321, 579 *A*.2d 360. As we later stated, "it would be contrary to the interests of society that funds dedicated to a charitable use be permitted to be diverted or diminished by the payments of judgments ... where suit is instituted by the beneficiary of the charity." *Jones v. St. Mary's Roman Catholic Church,* 7 *N.J.* 533, 537, 82 *A*.2d 187 (1951).

Over time, a number of other cognate notions were identified as animating the charitable immunity doctrine, including the maintenance and preservation of charitable organizations and their trust funds for the purposes for which they were donated, the encouragement of altruistic activity through private philanthropy, and the relief of the government from the need to provide beneficent services. *Restatement (Second) of Torts, supra,* § 895E (1979). *See also O'Connell, supra,* 171 *N.J.* at 496, 795 *A*.2d 857 ("[T]he [Charitable Immunity Act's] legislative history suggests that preservation of a charity's assets was only one of a number of purposes propelling the [statute's] enactment.").

In 1958, however, in a trilogy of cases, this Court abolished charitable immunity after finding that the doctrine "no longer comported with present day concepts of right, justice and morality." *Parker, supra,* 243 *N.J.Super.* at 322–23, 579 *A*.2d 360 (citing *Benton v. Y.M.C.A.,* 27 *N.J.* 67, 69, 141 *A*.2d 298 (1958); *Collopy v. Newark Eye & Ear Infirmary,* 27 *N.J.* 29, 39, 141 *A*.2d 276 (1958); *Dalton v. St. Luke's Catholic Church,* 27 *N.J.* 22, 24, 141 *A*.2d 273 (1958)). We declared that such immunity was "counter to widespread principles which fairly impose[d] liability on those who wrongfully and negligently injure[d] others." *Ibid.* (quoting *Collopy, supra,* 27 *N.J.* at 47, 141 *A*.2d 276).

In direct response to our action, in 1959 the Legislature promulgated the Charitable Immunity Act, *id.* at 323, 579 *A*.2d

360, essentially "reinstating the common law doctrine *as it had been judicially defined by the courts of this State.*" *O'Connell, supra,* 171 *N.J.* at 489, 795 *A.*2d 857 (emphasis added)(quoting *Wiklund v. Presbyterian Church of Clifton,* 90 *N.J.Super.* 335, 338, 217 *A.*2d 463 (Cty.Ct.1966)(citing *Anasiewicz v. Sacred Heart Church,* 74 *N.J.Super.* 532, 535, 181 *A.*2d 787 (App.Div.), *certif. denied,* 38 *N.J.* 305, 184 *A.*2d 419 (1962))). Stated differently, because "the verbiage employed [in the Act] closely parallels the cases in which the immunity rule was enunciated," *Parker, supra,* 243 *N.J.Super.* at 324, 579 *A.*2d 360 (quoting *Anasiewicz, supra,* 74 *N.J. Super.* at 535–36, 181 *A.*2d 787), "the effect of this statute was to reinstate the common law doctrine as it existed prior to its demise at the hands of the 1958 trilogy of *Benton, Collopy* and *Dalton.*" *Id.* at 323, 579 *A.*2d 360. Thus, the language of the Act should be construed "in light of *stare decisis* to the end that [the] *status quo* be preserved." *Parker, supra,* 243 *N.J.Super.* at 324, 579 *A.*2d 360 (quoting *Anasiewicz, supra,* 74 *N.J.Super.* at 535–36, 181 *A.*2d 787). Only those classes of entities that were immunized under common law remain within the sweep of the Act. However, as to those entities, the several provisions of the Act should be liberally construed to afford immunity. *N.J.S.A.* 2A:53A–10. That is the backdrop for our inquiry.

## IV

■  The Charitable Immunity Act provides that

[n]o nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall ... be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association....

[*N.J.S.A.* 2A:53A–7a.]

Accordingly, a statutorily enumerated institution seeking immunity must demonstrate that it "(1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a

beneficiary of the charitable works." *Hamel, supra,* 321 *N.J.Super.* at 72, 728 *A.*2d 264 (citations omitted). A non-profit entity that is organized exclusively for educational purposes satisfies the second prong. *Ryan, supra,* 175 *N.J.* at 346, 815 *A.*2d 419.

The Board maintains that it literally fits within that construct and that that should be the end of the inquiry. Tonelli asks that we eschew literal interpretation and hold that a school board is outside the scope of the Act even if it technically can satisfy the statutory terms.

We do not agree that the Board fits within the construct of a "non-profit corporation, society or association." *N.J.S.A.* 2A:53A–7a. On the contrary, as "an instrumentality of the State itself," *Durgin v. Brown,* 37 *N.J.* 189, 199, 180 *A.*2d 136 (1962), it seems to us that the Board is intrinsically distinct from the denominated entities. But even if we were to conclude that the Board's organizational structure does not clearly exclude it from the Act, that would not be the end of the inquiry. As we have said, only those entities that were immunized at common law are entitled to the protection of charitable immunity. We thus consider the legislative and judicial history of the Act to determine the status of a board of education at common law.

We turn first to the legislative proceedings antecedent to the Act. Except for one exchange during a legislative hearing that tends to support the notion that public schools were not within the contemplation of the drafters, *Public Hearing Before Assembly Judiciary Comm. on Assembly Comm. Substitute for Senate Bill No. S–204,* 107–08 (July 17, 1958), the legislative history is sparse and uninformative. We therefore consider judicial precedent for insight into the issue of whether a public entity was protected by common-law charitable immunity. Our research reveals that of the myriad of judicial decisions involving negligence claims against public entities at common law, not one directly raised, let alone held, that such an entity is entitled to charitable immunity.[1]

---

[1] The sole common law case that mentioned charitable immunity in the context of a public entity is *Kress v. City of Newark,* 9 *N.J.Super.* 70, 74 *A.*2d 902

Although the absence of decisions regarding a subject is not as satisfying as on-point holdings, that monolithic history suggests that the common law did not recognize charitable immunity as applicable to public entities. Indeed, over a quarter of a century ago, in *Winters, supra,* 63 *N.J.* at 7–8, 304 *A.*2d 196, we said just that.

There, we rejected an Appellate Division decision that a hospital, wholly owned and operated by a municipality qualified for limited charitable immunity[2] from liability to a patient who suffered injuries during his treatment. *Ibid.* In so doing, we adopted the dissenting opinion of Judge Lynch who concluded that the Act should be construed in light of its common-law roots. According to Judge Lynch, the common law recognized the difference between a public entity and the kinds of organizations to which charitable immunity was intended to apply:

> The words describing those organizations upon which the statute confers either total or limited immunity ("nonprofit corporation," etc.) have developed an established connotation in our law, i.e., a private charity which depends on charitable contributions and whose funds are held in trust solely for the purpose of the charity. The statutory language is derived directly from the cases which conferred immunity upon private charities at common law. A municipality is not such a corporation, society or association. It is organized under, and has the powers and duties provided for, in *N.J.S.A.* 40:42–1 *et seq.* I agree with what was said in *White v. Charity Hospital of La. In New Orleans,* 239 *So.*2d 385 (La.Ct.App.1970):
>
>> The moribund chimera of charitable immunity has no application to a government hospital. The anachronistically named Charity Hospital does not dispense charity but rather renders services to which qualified citizens are entitled as a matter of legal right; and it is supported not by alms but by taxes. Public hospitals, like public schools, are not charitable or eleemosynary institutions. [*Id.* at 386.]
>
> [*Winters v. Jersey City,* 120 *N.J.Super.* 129, 138, 293 *A.*2d 431 (App.Div.1972), *modified on dissent,* 63 *N.J.* 7, 304 *A.*2d 196 (1973)(Lynch, J., concurring in part and dissenting in part).]

----

(App.Div.1950), in which the applicability of the doctrine was not decided because the plaintiff was not a beneficiary of the hospital's works.

[2] At the time, the immunity statute, *N.J.S.A.* 2A:53A–8, limited the patient's recovery to $10,000. *Winters v. City of Jersey City,* 120 *N.J.Super.* 129, 131, 134, 293 *A.*2d 431 (1972).

In terms particularly relevant to the issue before us, Judge Lynch observed:

> If Section 8 is to be interpreted as applying to defendant municipality, then *N.J.S.A.* 24:53A–7 must be construed as affording total immunity to a Board of Education because it is organized "exclusively for educational purposes." Such is not the law and, indeed, so far as I know, the contention has never been made. *See Jackson v. Hankinson and Bd. of Ed. of New Shrewsbury*, 51 *N.J.* 230, 236 [238 *A.*2d 685] (1968); *Titus v. Lindberg*, 49 *N.J.* 66, 77 [228 *A.*2d 65] (1967); and *cf. Hartmann v. Maplewood School Transp. Co.*, 106 *N.J.Super.* 187 [254 *A.*2d 547] (Law Div.1969), *aff'd* 109 *N.J.Super.* 497 [263 *A.*2d 815] (App.Div.1970); *Estelle v. Board of Ed., Red Bank*, 26 *N.J.Super.* 9 [97 *A.*2d 1] (App.Div.1953), *modified on other grounds*, 14 *N.J.* 256 [102 *A.*2d 44] (1954).
>
> [*Id.* at 140, 293 *A.*2d 431.]

In effect, Judge Lynch detailed what our own research has revealed—that public entities were never insulated from common-law tort liability by charitable immunity:

> [T]he clear language of the "limited immunity" statute, *N.J.S.A.* 2A:53A–8, refers only to those hospitals which were protected by "charitable immunity" before abolition of that doctrine in *Dalton v. St. Luke's Catholic Church*, 27 *N.J.* 22 [141 *A.*2d 273] (1958); *Collopy v. Newark Eye and Ear Infirmary*, 27 *N.J.* 29 [141 *A.*2d 276] (1958), and *Benton v. Y.M.C.A.*, 27 *N.J.* 67 [141 *A.*2d 298] (1958).... The statute cannot be construed as applying to a municipality operating a city hospital. [*Ibid.*]

Recently, the Appellate Division adopted the *Winters* rationale. In *Hamel, supra,* 321 *N.J.Super.* at 70–71, 728 *A.*2d 264, a student at a public middle school and her parents sued the Bergenfield Board of Education, alleging that the Board failed to take appropriate measures to end various forms of taunting and harassment that the student suffered at the hands of her classmates. There, the Appellate Division held "that the [Act] was not intended to provide immunity to public entities such as local school boards," *id.* at 70, 728 *A.*2d 264, and cited *Winters, supra,* 120 *N.J.Super.* at 144–45, 293 *A.*2d 431 (Lynch, J.A.D., concurring in part and dissenting in part), for the proposition that a public school board, a tax-funded entity like a municipal hospital, does not qualify for charitable immunity. *Hamel, supra,* 321 *N.J.Super.* at 75, 728 *A.*2d 264. In *Gerber, supra,* 328 *N.J.Super.* at 30–33, 744 *A.*2d 670, a student at a public junior high school and her parents filed suit against the Board of Education, claiming that it negligently

failed to prevent the student from being assaulted by a classmate. Relying upon *Hamel*, the Appellate Division refused to apply charitable immunity to the Board and its members, writing, "[a] local board of education is not entitled to immunity under the [Act]." *Id.* at 40, 744 *A*.2d 670 (citing *Hamel*, *supra*, 321 *N.J.Super.* at 77, 728 *A*.2d 264).

■ Recapping, *Winters* held that purely publicly funded governmental entities, created to provide services to which our citizens are entitled as a matter of right, were never within the contemplation of the Charitable Immunity Act. The Legislature is presumed to be aware of the judicial construction placed on an enactment, and such a construction, supported by lengthy legislative acquiescence or failure to amend the statute should be viewed as dovetailing with legislative intent. *Macedo v. Dello Russo*, 178 *N.J.* 340, 346, 840 *A*.2d 238 (2004); *see also Quaremba v. Allan*, 67 *N.J.* 1, 14, 334 *A*.2d 321 (1975). Subsequent to *Winters*, and despite the fact that the Legislature had occasion to revisit and amend or expand the Charitable Immunity Act eight times,[3] it did not alter the *Winters* principle that public entities are outside the reach of the Act. We take that acquiescence as further evidence that *Winters* was in accord with the Legislature's intent.

We reaffirm that entirely sensible holding today. The Board's argument that no exception for public entities is contained in the literal language of the Charitable Immunity Act is unpersuasive. That claim misses the proverbial forest for the trees. The primary purposes of the Act—protecting private trust funds and contributions, encouraging altruistic activity and private philanthropy, and relieving the government of the obligation of providing beneficent services—are not advanced by affording immunity to a purely public entity. To the extent that *Muntz v. Newark City*

---

[3] The Act has been modified eight times: *L.* 1995, *c.* 183; *L.* 1991, *c.* 187, § 48; *L.* 1989, *c.* 283, § 1; *L.* 1989, *c.* 249; *L.* 1989, *c.* 171, § 1; *L.* 1988, *c.* 179, § 1; *L.* 1988, *c.* 87, § 2; and *L.* 1987, *c.* 87, § 1.

*Hospital,* 115 *N.J.Super.* 273, 279 *A.*2d 135 (App.Div.1971), may be read to suggest otherwise, it is disapproved.

Nothing in our recent decisions in *O'Connell* and *Ryan* has, in any way, altered that landscape. In *O'Connell,* a case involving a student injured at Montclair State University, Montclair invoked charitable immunity on the ground that it was a private non-profit corporation organized exclusively for educational purposes. 171 *N.J.* at 486-87, 795 *A.*2d 857. Although we ultimately agreed that Montclair was entitled to immunity, our starting point in *O'Connell* was to reaffirm the basic principle of *Winters:* that purely publicly funded governmental agencies, created to provide services to which our citizens are entitled as a matter of right, are not and have never been within the contemplation of the Charitable Immunity Act. *Id.* at 493-95, 795 *A.*2d 857.

What *O'Connell* recognized, however, was that there are entities with mixed public and private elements, and that such hybrids need to be analyzed in light of the aims underlying charitable immunity. So analyzed, Montclair was allowed to invoke charitable immunity essentially because it is *not* governmentally operated; it is *not* wholly supported by public funds but largely by tuition and charitable contributions; and it *does not* provide a service to which our citizens are entitled as of right. *Id.* at 493-96, 795 *A.*2d 857. Put differently, the purposes informing the Act would be advanced by cloaking Montclair in charitable immunity. Contrary to the Board's argument here, *O'Connell* did not alter *Winters'* fundamental holding that purely public entities are not entitled to charitable immunity; rather, it held that, because of its hybrid nature, Montclair is not such an entity. *Id.* at 497, 795 *A.*2d 857.

Nor does *Ryan* change that calculus. *Ryan* simply held that a purely private entity, with no public aspects, that is organized exclusively for educational purposes satisfies the second prong of the Act. 175 *N.J.* at 346, 815 *A.*2d 419. Thus, we read the Act, as we did over a quarter of a century ago in *Winters,* as

inapplicable to purely public entities which were not immune at common law.

V

■ That brings us to the facts in this case and the issue of where a local school board is positioned on the continuum between a charity and a public entity. The New Jersey Constitution prescribes:

The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.

[*N.J. Const.* art. VIII, § 4, ¶ 1.]

The governmental vehicle through which that mandatory education takes place is the local school board. *See N.J.S.A.* 18A:8–1 ("Each municipality shall be a separate school district . . . .").

Unlike the state college considered in *O'Connell,* the public school board bears none of the indicia of a private charity. It is not supported by charitable contributions, philanthropic activity or a spirit of altruism. On the contrary, its sole source of revenue is public funds in the form of "taxes and government aid." *Hamel, supra,* 321 *N.J.Super.* at 75, 728 *A.*2d 264. Neither is it an entity that relieves the government of the need to provide beneficent services. Rather, it is the government in action—"an instrumentality of the State itself" that is "obligated to meet the educational needs of the children" in its district. *Durgin, supra,* 37 *N.J.* at 199, 180 *A.*2d 136.

In short, the hybrid nature of the state college that qualified it for charitable immunity in *O'Connell* is entirely lacking in the case of a school board which falls squarely at the public entity end of the charity-to-government continuum. To be sure, such an entity is entitled to government immunity under the Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, but not to charitable immunity. A public school board is simply not a charity within the meaning of the Charitable Immunity Act.

## VI

█ We affirm the judgment of the Appellate Division to that effect and declare that the Charitable Immunity Act has no applicability to public entities supported entirely by tax dollars and providing services to which the public is entitled as of right.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.