9 A.3d 1044 (2010)
417 N.J. Super. 309
ESTATE OF Stephen J. KOMNINOS, Thomas J. Komninos, Winifred Komninos, Individually as Administrators, and as Administrators ad prosequendum of the Estate of Stephen J. Komninos, Plaintiffs-Respondents,
v.
BANCROFT NEUROHEALTH, INC.; Bancroft Schools and Communities, Inc.; Caroline Eggerding, Ph.D.; Melissa Wheatcroft, Esq.; Joseph Atkinson; Bancroft Board of Trustees (Lisa B. Alberts, MSN; Jeffery Harris; Bernett Johnson, Jr., M.D.; Robert Mate; Frederick Rohloff, Esq.; Ronald Williams; and Leon Zimmerman, jointly, severally, and/or in the alternative); Dana Wales; Susan Whited; Pam Vannoni; Laura Devine; Sandy Romsteadt; Tony DiBartolo; Quianna Steele; and Adam Allibone, Defendants-Appellants, and
Toni Pergolin; Kathy Ross; Stephen S. Bruce; Jennifer Sells; Dr. Robert Martin; Dr. Terry Page; Daniel Keating; Donna Phillips; Michael Grim; Lynn Farbman; Laikeshia Abrams; Stephanie Balsanti; Kathleen Sutcliffe, RN; Paul DiGiacoma; Leroy Jacobs; Idowu Adeniren; Paul Amarando; Jerry Valencia; 7-Eleven, Inc.; Manzar Rahmani; Mahjabeen Rahmani; and Gregory J. Mayer, Defendants.
Docket No. A-4041-09T2.
Superior Court of New Jersey, Appellate Division.
Argued November 1, 2010.
Decided December 13, 2010.
*1046 Derek M. Daniels argued the cause for appellants (McCumber, Daniels, Buntz, Hartig & Puig, P.A., attorneys; Mr. Daniels, Frederick J. Hughes and Mary Beth Davis, on the brief).
George G. Horiates argued the cause for respondents.
Before Judges REISNER, SABATINO and ALVAREZ.
The opinion of the court was delivered by
SABATINO, J.A.D.
On leave granted, we review an interlocutory order denying a motion for partial summary judgment filed by twenty-two defendants in this wrongful death and survival action. In their motion, defendants sought to have the claims against them dismissed pursuant to the Charitable Immunity Act ("the Act"), N.J.S.A. 2A:53A-7. The motion judge denied the application, based upon his perception that genuine issues of material fact existed concerning the moving defendants' entitlement to the statutory immunity.
Because we are satisfied that defendants are entitled to the protections of the Act as a matter of law, and that no material factual issues need to be resolved concerning their immunity from plaintiffs' claims of ordinary negligence, we reverse the trial court's order denying partial summary judgment. However, we remand for further proceedings with respect to plaintiffs' claims alleging gross negligence and more severe wrongdoing, which are not immunized under the Act.

I.
This tragic case arises from the death of Stephen J. Komninos ("Stephen"), a developmentally disabled young man, who died in October 2007 after he choked on a bagel. At the time of his death, Stephen was a resident of a community group home in Cherry Hill operated by defendant Bancroft Neurohealth, Inc. ("Bancroft"). All of the co-defendants who join Bancroft in this appeal have either been employed by, or otherwise affiliated with, Bancroft. Plaintiffs are Stephen's parents, who brought the instant action as the administrators of his estate.
As is customary in reviewing appeals from summary judgment rulings, we consider the factual record in a light most favorable to plaintiffs as the non-moving parties. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); see also Estate of Hanges v. Met. Prop. & Cas. Ins. Co., 202 N.J. 369, 374, 997 A.2d 954 (2010).

*1047 A.
Stephen was born in July 1985. About a year after his birth, Stephen was diagnosed with multiple disabling conditions. Those conditions included severe static encephalopathy, autism, mental retardation, impulse control disorder, and severe developmental delay with cognitive, motor, and language limitations.
Shortly before his ninth birthday, Stephen was admitted to Bancroft's community group home program. During his thirteen years as a residential student, Stephen successively resided in three of Bancroft's group homes. These group homes are described in the record as "family-style households shared by six to eight clients supervised and trained by a house manager and round the clock professional staff."
While residing in the group homes, Stephen worked in various jobs at the Bancroft School, which included attending the parking lot, shredding paper, and helping to prepare and sell bagels. Stephen was regularly transported to and from the school facilities in a group home van. Stephen transitioned to Bancroft's "Adult Services" program in July 2007, at the age of twenty-two. He continued to reside in Bancroft's group homes as part of its "Adult Residential" program.
Stephen's June 2007 individual habilitation plan ("IHP") specified, among other things, that "[t]he residential team will continue to support Stephen with access to the community and provide[] transportation and supervision as required." However, Stephen was not authorized under his IHP to hold money, as he required the assistance of staff with "[a]ll aspects of purchasing." Further, the IHP specified that Stephen required "arms length supervision in the community to ensure his safety."
Due to safety concerns, the IHP stated that "Stephen [was not to be given] the opportunity to be alone at this time during awake hours." As of the time of his last IHP in June 2007, Bancroft's staff noted that "Stephen should never be left unsupervised due to possible problem behaviors and for safety concerns." Staff further noted that Stephen had a "lack of safety awareness," that he needed "assistance with daily living skills," and that Stephen's life plan should include "[i]ncreasing his independence with his self-care and domestic skills[.]"
One of the itemized goals in Stephen's June 2007 IHP was making a small purchase from a convenience store. The IHP indicated that, as of that time, Stephen was able to "make a small purchase from a convenience store with 80% accuracy." According to his IHP, "[v]arious staff working with Stephen will be implementing this goal. The goal should be practiced at least one time per week or when Stephen requests to go to a convenience store."
In order to facilitate the achievement of its residents' individualized goals, Bancroft employed "program associates." Those associates were hired to provide supervision, guidance, and instruction, both in the group home settings and in community environments. On May 11, 2007, Bancroft hired defendant Adam Allibone as such a program associate. At the time of his hire, Allibone was eighteen years old. Allibone was the associate assigned to Stephen's care on October 4, 2007, the day of the fatal incident.
Although Allibone's statements about what transpired on October 4, 2007 leading up to Stephen's death have varied to some degree, those variations, for the reasons we explain later in this opinion, are legally inconsequential with respect to plaintiffs' negligence claims. This much is clear. In *1048 the early evening of October 4, 2007, Allibone drove Stephen in one of Bancroft's vans to a 7-Eleven convenience store in Stratford. Allibone and Stephen got out of the parked van and went inside the store. Stephen took a bagel, left the store, and returned to the van. Allibone paid for Stephen's bagel and, as reflected by a cash receipt, also purchased a cigar for himself. Moments later, while back in the van, Stephen bit down on the bagel and began to choke. Allibone attempted to render aid and stop the choking.
As Allibone tried to clear Stephen's airway, a bystander called 9-1-1. An ambulance arrived and Stephen was transported to Kennedy Memorial Hospital in Stratford, where he was placed on life support. Four days later, Stephen was declared brain dead, and his life support was terminated. He expired on October 8, 2007.
In September 2008, plaintiffs filed a complaint in the Law Division against Bancroft, Allibone, and various other defendants affiliated with Bancroft (collectively, "the Bancroft defendants"), as well as 7-Eleven, Inc., and three individuals affiliated with 7-Eleven (collectively "the 7-Eleven defendants").[1] The complaint was amended in February 2009 to expand the allegations and the named defendants.
As amended, the complaint principally alleged that each of the defendants acted in a "negligent and/or grossly negligent" manner that led to Stephen's death. As to defendant Allibone individually, the complaint alleged intentional conduct, in addition to negligent and/or grossly negligent acts or omissions. Plaintiffs asserted causes of action for wrongful death and survival. Plaintiffs further pleaded claims of negligent hiring, staffing and administration; intentional and negligent infliction of emotional distress; negligent emergency procedures and/or rescue; fraudulent concealment of evidence; and violations of certain statutes and regulations pertaining to developmentally disabled persons. The complaint demanded both compensatory and punitive damages. Eventually, plaintiffs voluntarily dismissed several of the individual Bancroft defendants by a stipulation.[2]
After discovery was conducted, the Bancroft defendants filed numerous motions. Among other things, the trial court dismissed the counts in the complaint alleging intentional and negligent infliction of emotional distress, concluding that those counts failed to state a claim upon which relief may be granted. The court also granted defendants' motions for partial summary judgment dismissing the fraudulent concealment claims, the claims based upon alleged statutory and code violations, and the claims against fictitious defendants. Plaintiffs have not sought leave to appeal from those dismissals.
The motion that principally led to the present interlocutory appeal was filed on behalf of the remaining Bancroft defendants, seeking partial summary judgment on the basis of charitable immunity under the Act. Returnable on the same day was a motion by the Bancroft defendants to dismiss the claims of punitive damages, which had been predicated on alleged wrongful conduct more severe than negligence. Plaintiffs opposed both motions, *1049 and the trial court heard extensive oral argument.
Upon considering the parties' contentions, the judge denied the motion for charitable immunity and the motion to strike the punitive damages, both without prejudice. As to the charitable immunity issues, the motion judge concluded in his bench ruling that:
[I]n this [c]ourt's opinion, there indeed remain genuine issue[s] of material fact in dispute as to whether the outing to 7-Eleven that led to [Stephen]'s death was in furtherance of his education and entitled to charitable immunity. There are still issues of material fact as to whether the defendant, Bancroft Neuro-Health, [was] promoting religious, charitable[,] or educational purposes at the time of [Stephen's injury], and whether that qualifies Bancroft for charitable immunity pursuant to N.J.S.A. 2[A]:53[A]-7.
[Emphasis added.]
The judge did not specify in his oral opinion, nor in his corresponding order denying partial summary judgment, whether the perceived fact issues affecting the immunity would be resolved in a pre-trial evidentiary hearing, through renewed motions after the proofs were presented at trial, or through special interrogatories to the jury on the verdict form.
As to defendants' motion to strike the punitive damages claims, the judge was likewise persuaded that the factual record was too indefinite to enable a conclusive disposition yet as to whether any of the defendants had engaged in wrongful conduct more severe than negligence. In this regard, the judge observed that there are genuine issues of material fact, particularly as to three questions:
[O]ne, whether Ste[ph]en was left unsupervised after he was classified as a resident who needed to always be "within arms' length"; two, why Mr. Adam Allibone was assigned to Ste[ph]en after being reprimanded in the past for failing to administer the proper level of support; and three, whether Bancroft NeuroHealth consistently failed to monitor Ste[ph]en after 16 reported cases and 13 substantiated cases of neglect.
Defendants moved for reconsideration on the charitable immunity rulings, an application which the court denied without elaboration. Defendants also moved for reconsideration on the punitive damages rulings.
Defendants then moved for leave to appeal the trial court's respective orders denying partial summary judgment on charitable immunity and denying reconsideration of that ruling. We granted that application for leave to appeal.
The trial court subsequently heard several days of argument on defendants' motion for reconsideration of the punitive damages claims. The trial court dismissed those claims as to three of the individual defendants and denied reconsideration as to the rest. Defendants sought leave to appeal the trial court's respective orders declining to strike the punitive damages claims and denying reconsideration, which we denied.
No cross-motion for leave to appeal was filed by plaintiffs.

II.
In reviewing the denial of defendants' immunity motion, we consider the trial court's determination de novo because their asserted right to charitable immunity under the statute raises questions of law. "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995). If the record reflects no material facts in dispute as to *1050 whether the institutional defendant was organized for exclusively educational or charitable purposes, or as to whether the injured party was a beneficiary of defendant's works, the dispositive immunity issues become "purely a matter of law" to be decided by the court. Auerbach v. Jersey Wahoos Swim Club, 368 N.J.Super. 403, 410, 846 A.2d 646 (App.Div.) (quoting Pomeroy v. Little League Baseball, 142 N.J.Super. 471, 473, 362 A.2d 39 (App.Div. 1976)), certif. denied, 180 N.J. 458, 852 A.2d 194 (2004).

A.
The Charitable Immunity Act encourages private philanthropic activity by affording statutory immunity to qualifying non-profit organizations. The Act was designed by the Legislature to foster the private provision of services that benefit the general welfare, thus relieving the government of the obligation to provide those services. Abdallah v. Occupational Ctr. of Hudson Cty., Inc., 351 N.J.Super. 280, 284, 798 A.2d 131 (App.Div.2002); Parker v. St. Stephen's Urban Dev. Corp., 243 N.J.Super. 317, 324-25, 579 A.2d 360 (App. Div.1990). In particular, the Act instructs that:
No nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association.
[N.J.S.A. 2A:53A-7(a) (emphasis added).]
Whether an organization is devoted to a covered purpose, for purposes of immunity under the Act, depends on the facts and circumstances of each case. Bieker v. Cmty. House of Moorestown, 169 N.J. 167, 175, 777 A.2d 37 (2001); Presbyterian Homes v. Div. of Tax Appeals, 55 N.J. 275, 284, 261 A.2d 143 (1970).
In order to receive the immunity protections under the Act, a defendant institution must show that it: (1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable, or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works. Bieker, supra, 169 N.J. at 175, 777 A.2d 37 (quoting Hamel v. State, 321 N.J.Super. 67, 72, 728 A.2d 264 (App.Div.1999)). Plaintiffs concede that Bancroft is a nonprofit organization incorporated under the New Jersey Nonprofit Corporation Act, N.J.S.A. 15A:1-1 to:16-2. Hence, the two pivotal issues are, first, whether Bancroft was organized exclusively for religious, charitable, or educational purposes, or some combination thereof; and, second, whether Stephen was a beneficiary of Bancroft's works at the time of his fatal incident. We examine those questions in turn.

B.
We first consider Bancroft's contention that it has been organized for one or more of the purposes enumerated in the Act. In evaluating that assertion of protected status, we are mindful that the *1051 strong public policy underlying the Act compels its liberal construction. P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 148, 962 A.2d 453 (2008) (citing Monaghan v. Holy Trinity Church, 275 N.J.Super. 594, 598, 646 A.2d 1130 (App.Div.1994)). Given that legislatively-codified public policy, nonprofit organizations are afforded "substantial latitude in determining the appropriate avenues for achieving their objectives." Bloom v. Seton Hall Univ., 307 N.J.Super. 487, 491, 704 A.2d 1334 (App. Div.), certif. denied, 153 N.J. 405, 709 A.2d 798 (1998).
The record shows that Bancroft's institutional mission is largely based upon educational objectives, in the particularized context of serving minors and adults who have developmental disabilities. "[T]he term `educational' [in the Act] has been broadly interpreted and [is] not limited to purely scholastic activities." Orzech v. Fairleigh Dickinson Univ., 411 N.J.Super. 198, 205, 985 A.2d 189 (App.Div.2009) (citing Bloom, supra, 307 N.J.Super. at 492, 704 A.2d 1334), certif. denied, 201 N.J. 443, 991 A.2d 232 (2010). Under the structure of the Act, "[e]ntities that can prove they are organized exclusively for educational or religious purposes automatically satisfy the second prong of the charitable immunity standard." Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 346, 815 A.2d 419 (2003).
As reflected in its charter, one of Bancroft's central organizational purposes is to "direct and manage programs for the education, treatment, life skills support and spiritual well-being of individuals with developmental disabilities." (Emphasis added). The diverse social and community experiences that Bancroft incorporates into its curriculum are consistent with the beneficial public policy objectives underlying the Act.
Plaintiffs argue that Bancroft is not predominantly engaged in "educational" programs, but rather that it engages in residential care and a variety of other services that plaintiffs regard as beyond the notion of "educational." With respect to Stephen, in particular, plaintiffs emphasize that he, as the record terms it, "graduated" from the Bancroft School in July 2007, several months before his tragic accident, and that the adult programs that he thereafter received were not educational.
We reject plaintiffs' narrow conception of an educational program covered by the Act. To be sure, the developmentally disabled persons who receive Bancroft's services are not only minors who would otherwise be attending elementary or secondary schools or undergraduate programs, but also adults. We recognize that many of those adults reside in Bancroft facilities. However, we do not conceive that the educational component of Bancroft's mission ceases when residents such as Stephen end their classroom studies. The learning process for those residents continues long after they reach the age of majority and are no longer eligible for a taxpayer-funded public education. The residents continue to be instructed in occupational skills, "life skills," and other dimensions of learning.
The IHP for Stephen illustrates the continuing education that he was receiving from Bancroft even after he "graduated" from the Bancroft School. Pursuant to N.J.A.C. 10:44A-4.3(a), an institution such as Bancroft, operating under the New Jersey Developmentally Disabled Rights Act, N.J.S.A. 30:6D-1 to -12, must "establish and implement a procedure to address the development, implementation, review and evaluation of each individual's habilitation or service plan as required by [the statute]." Subsection (c) of that State regulation requires the comprehensive IHP to include, among other things, an "identification *1052 of [the] person's preferences, capabilities and needs;" the person's goals; "measurable, sequential objectives" for the person; a "clearly stated method of achieving each objective;" identification of the persons responsible for providing the services; and a listing of all current and planned services. N.J.A.C. 10:44A-4.3(c). In this comprehensive fashion, the IHP expresses what the developmentally disabled person needs and how those objectives are to be pursued.
A critical aspect of the IHP is the individual's continued training and education. This is plainly reflected in the regulatory definition of an IHP, as set forth in N.J.A.C. 10:44A-1.3:

"Individual Habilitation Plan" (IHP) means a written plan of intervention and action that is developed by the interdisciplinary team in accordance with N.J.S.A. 30:6D-10 through 12, and N.J.A.C. 10:44A-4.3. The IHP specifies both the prioritized goals and objectives being pursued by each individual and the steps being taken to achieve them, and may identify a continuum of skill development that outlines progressive steps and the anticipated outcomes of services. The IHP is a single plan that encompasses all relevant components, such as an education plan, a behavior modification plan, a program plan, a rehabilitation plan, a treatment plan and a health care plan. The complexity of the IHP will vary according to the needs, capabilities and desires of the person. In most instances, the IHP will address all of the major needs which have been identified. The major needs are prioritized. For an individual who makes only specific services requests, the IHP is a service plan that addresses only those specific requests.
[N.J.A.C. 10:44A-1.3 (emphasis added) (definitional section).]
Stephen's own IHP reflected the continued instruction and training that he was to receive within the institution after he no longer attended the Bancroft School. Although the IHP materials indicated that his "[e]ducation goals [were to] be discontinued at the end of the 2006-2007 school year," the IHP also envisioned that Stephen would continue to "learn to better communicate his wants and needs" and "[i]ncreas[e] his independence with his self-care and domestic skills[.]" (Emphasis added). Upon his graduation from the Bancroft School, the IHP called for Stephen to begin "an adult vocational program" by July 2, 2007. The representatives of that vocational program were to be supplied with the two new sets of "sign/communication books" for Stephen created by a speech therapist. Stephen would continue to be taught life skills, such as domestic tasks and community tasks.
In sum, Stephen came to Bancroft at the age of eight as a student. He remained a student at Bancroft and resided at Bancroft for over a decade. His enrollment in Bancroft's adult programs at the time of his tragic death was an outgrowth of his continuing instruction.
Given that ongoing instruction, both vocational and life-skills-related in nature, provided by Bancroft to Stephen and to other developmentally disabled persons enrolled in its programs, we conclude as a matter of law that these are all valid and protected educational objectives in this setting that fall under the umbrella of the Act. Vocational training is inherently a form of education. See N.J.A.C. 12:23-1.1 (defining vocational training as "training or instruction, which is related to an occupation and is designed to enhance the marketable skills and earning power of a worker or job seeker"); see also Collins English Dictionary (10th ed. 2009) (defining vocational as "of or relating to applied *1053 educational courses concerned with skills needed for an occupation, trade, or profession," (emphasis added)).[3]
The same is true of life skills instruction. As our Supreme Court noted in discussing programs for the developmentally disabled, the concept of "habilitation" itself "has been defined as the acquisition and maintenance of `those life skills which enable [residents] to cope more effectively with the demands of [their] own person[s] and of [their] environment and to raise the level of [their] physical, mental, and social efficiency.'" N.J. Ass'n for Retarded Citizens v. N.J. Dep't of Human Servs., 89 N.J. 234, 239 n. 3, 445 A.2d 704 (1982) (emphasis added) (quoting Wyatt v. Stickney, 344 F.Supp. 387, 395 (M.D.Ala.1972), aff'd sub nom. Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir.1974)). See also Disabilities Res. Ctr./Atlantic & Cape May, Inc. v. City of Somers Point, 371 N.J.Super. 1, 5, 851 A.2d 792 (App.Div.2004) (sustaining a tax exemption for a nonprofit facility that provided, among other things, "training in basic life skills development" for developmentally disabled residents, (emphasis added)). As illustrated by Stephen's IHP in the instant case, such life skills are to be instilled through an ongoing process of instruction, assessment, and reinforcement. Each of these facets is a hallmark of a learning process. Whether or not such life skills training is performed in a traditional classroom, it can be fairly considered as "educational" within the ambit of the Charitable Immunity Act.
We doubt that the Legislature intended the Charitable Immunity Act, a statute that must be broadly construed, to exclude such important instructional endeavors from the ambit of programs protected by the Act. A contrary reading might cause provider organizations such as Bancroft to leave New Jersey or close their doors, out of fear of sizeable tort judgments if they are sued for negligence.
We are also satisfied that Bancroft has been organized and operated for a "charitable" purpose. As stated in its by-laws, one of Bancroft's organizational purposes is "[t]o operate exclusively for its own charitable purposes[.]" It is registered as an educational and charitable organization under Section 501(c)(3) of the Internal Revenue Code. Through fund raising, Bancroft received over $1.1 million in private charitable contributions in fiscal year 2006.
Plaintiffs point out that less than two percent of Bancroft's revenue stream comes from charitable donations, the remainder mainly being funded through government grants. While that may be so, the percentage figure does not rigidly dictate the analysis of charitable status.
Plaintiffs rely upon Abdallah, supra, which reversed summary judgment granting charitable status to an entity that received donations amounting to $48,000 (less than one-and-one-half percent of its *1054 revenues) in 1995, and under $3,000 (less than one-tenth of a percent of its revenues) in 1996. In Abdallah, the level of charitable contributions was found to be too insignificant to impact the charitable status determination. Abdallah, supra, 351 N.J.Super. at 288-89, 798 A.2d 131. Here, although the percentages are only slightly greater than those in Abdallah, the sheer magnitude of the $1.1 million that Bancroft received in charitable donations warrants a different conclusion. We do not read Abdallah as adopting a per se bright-line percentage-cutoff for determining charitable status. See also Pelaez v. Rugby Labs., Inc., 264 N.J.Super. 450, 453-58, 624 A.2d 1053 (Law Div.1993) (granting charitable immunity to a defendant that received over eighty percent of its funding from governmental grants, but which also received and relied upon over $400,000 annually from outside contributions, which the defendant actively sought and which the court characterized as "a substantial amount of income").
Viewing the totality of Bancroft's programmatic objectives, in tandem with its budget, we are satisfied that Bancroft is entitled to the protections of a charitable organization under the statute. Moreover, for the reasons we have already expressed, Bancroft's immunized status is established by its core educational purposes. In combination, the educational and charitable elements of Bancroft's mission fortify one another in placing Bancroft within the zone of the Act's protection. No further fact-finding is necessary to reach these legal conclusions.

C.
The second pivotal issue before us is whether Stephen was a "beneficiary" of Bancroft's works at the time of his fatal accident. To receive the protections of the Act, a defendant asserting charitable immunity must be engaged in "such purposes at the time of the injury to the plaintiff, who was then a beneficiary of its charitable works." Loder v. St. Thomas Greek Orthodox Church, 295 N.J.Super. 297, 301, 685 A.2d 20 (App.Div.1996).
In Orzech, we noted that "[t]he cases make clear that beneficiary status turns on whether the charitable organization was performing its charitable works at the time of the accident, and the relationship at that time of the organization and the claimant." Orzech, supra, 411 N.J.Super. at 209, 985 A.2d 189. We further noted that "the Act contemplates that charitable organizations will negligently cause injury to persons who, at least to some degree, are beneficiaries of their charitable works at the time of the injury, and that is precisely the conduct for which immunity is granted." Id. at 210, 985 A.2d 189 (citing N.J.S.A. 2A:53A-7(a)).
Here, plaintiffs argue that Bancroft is not entitled to immunity, as Stephen allegedly was not a beneficiary of Bancroft at the time of the incident. Plaintiffs argue, in particular, that Stephen could not have been a beneficiary of Bancroft because: (1) Allibone and Stephen were not at the 7-Eleven to make a community purchase; (2) Allibone did not stay within arm's length of Stephen; (3) Allibone left Stephen in the van alone; and, (4) Allibone did not follow Bancroft's procedures in initiating the outing, and he did not even know what those procedures were. Plaintiffs further argue that Allibone's descriptions of the occurrences at the 7-Eleven are unreliable, due to his "unsightly conduct" and his "various versions of the incident."
Despite the variations in Allibone's narrative, the essential, undisputable fact is that Bancroft was responsible for Stephen's care, twenty-four hours a day, seven days a week, 365 days a year. Stephen's *1055 care plan specifically included "community" outings, such as making a retail purchase. Allibone, a Bancroft employee, was assigned to Stephen's care on October 4. Allibone and Stephen left Bancroft premises in a Bancroft van. Allibone drove to the 7-Eleven. Allibone purchased items at the 7-Eleven. Stephen choked on one of those items, while he was in the Bancroft van, in the presence of Bancroft employee Allibone. Even when these core facts are viewed in the light most favorable to plaintiffs, the non-moving parties, Stephen was a Bancroft beneficiary at the time that he was mortally injured.
The scenario in Orzech, supra, reinforces the propriety of applying the statutory immunity to the Bancroft defendants in this case. Orzech was a student and resident advisor at Fairleigh Dickinson University. After a night of drinking at a party in the dormitory with other students, Orzech became extremely intoxicated. The party was in direct violation of the university's policies that prohibited the use of grain alcohol in the dormitories and that prohibited games that encouraged excessive drinking. Still intoxicated after a short period of sleep, Orzech awakened in the early morning, leaned out of his dormitory window, and fell from the fourth floor to his death. We held in Orzech that, despite the apparent violations of the university's dormitory rules and policies, Orzech was a beneficiary of the school's educational works at the time of his tragic fall. Orzech, supra, 411 N.J.Super. at 210-11, 985 A.2d 189.
Likewise here, the fact that Allibone may have violated Bancroft's rules, or Stephen's IHP, at the time of the trip to the 7-Eleven does not vitiate the general immunity covering negligence by the Bancroft defendants. The deviations from the institution's policies, while perhaps germane to other issues such as fault rising higher than simple negligence, did not defeat Stephen's beneficiary status.
Consequently, there is no material factual issue to be resolved as to the applicability of the Act to this case. The question posed by the motion judge concerning "whether the outing to 7-Eleven that led to [Stephen]'s death was in furtherance of his education and entitled to charitable immunity" does not require an evidentiary or fact-finding hearing because the undisputed facts establish that Stephen was a beneficiary of Bancroft, regardless of the precise sequence of events at the 7-Eleven. Although we appreciate that the record is not clear about some of the particulars such as, for example, whether Allibone's trip to the 7-Eleven was in part motivated by a personal desire to buy himself a cigar, or whether Allibone delayed in walking back to the van after Stephen left the store, those incidental details do not eliminate Bancroft's overarching immunity. In making these observations, we do not contend that any trip in which Allibone accompanied Stephensuch as, hypothetically, a trip to a tavern, a shooting range, or a casinowould necessarily be included within Stephen's beneficiary status. Without deciding how the issues would be resolved in those and other more-attenuated contexts, we hold that the trip to the 7-Eleven in the present case, and the purchase of the bagel for Stephen, had a sufficient nexus to Bancroft's overall program to maintain his beneficiary status.
We also are mindful that immunity under the statute is immunity from suits for negligence. Thus, it is imperative that only the critical factual issues that would alter Bancroft's legal entitlement to immunity are reserved for trial. See Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589, 595 (1991) (stressing *1056 the importance of "resolving immunity questions at the earliest possible stage in litigation"); see also Schneider v. Simonini, 163 N.J. 336, 355-56, 749 A.2d 336 (2000) (applying that general principle in the context of a motion for qualified immunity by a defendant state official), cert. denied, 531 U.S. 1146, 121 S.Ct. 1083, 148 L.Ed.2d 959 (2001).

D.
For these various reasons, the trial court's denial of partial summary judgment respecting charitable immunity as to plaintiffs' claims of ordinary negligence, and its denial of reconsideration on that particular issue, is reversed.

III.
We briefly comment on plaintiffs' remaining claims sounding in gross negligence or otherwise alleging a higher degree of fault than ordinary negligence. See, e.g., Stelluti v. Casapenn Enters., L.L.C., 203 N.J. 286, 312-13, 1 A.3d 678 (2010) (recognizing the qualitative distinction between ordinary negligence and gross negligence or other more culpable forms of tortious conduct). The claims of gross negligence and other more culpable conduct in the complaint are potentially significant here, because the Charitable Immunity Act does not insulate defendants from liability for conduct more serious than ordinary negligence. See P.V., supra, 197 N.J. at 148 n. 6, 962 A.2d 453; see also Hardwicke v. Am. Boychoir Sch., 188 N.J. 69, 97, 902 A.2d 900 (2006).
Although defendants assert in their brief that "[t]he dismissal of the other claims [in the case] effectively makes the [m]otion for [p]artial [s]ummary [j]udgment based on [c]haritable [i]mmunity a [m]otion for [f]inal [s]ummary [j]udgment, as the granting would act to bar all of the remaining claims, which are sounded in negligence[,]" they do not elaborate upon that assertion. Moreover, we have denied defendants' motion for leave to appeal the trial court's decision to preserve most of plaintiffs' punitive damages claims, which arise out of alleged wrongful conduct more severe than negligence. Consequently, we remand the case to the trial court for further proceedings on these unresolved issues.
Reversed in part and remanded.
NOTES
[1] While this interlocutory appeal was pending, plaintiffs entered into a settlement with the 7-Eleven defendants. Counsel advised us that all defendants remaining in this case are affiliated with Bancroft.
[2] The dismissed defendants were Kathy Ross, Stephen Bruce, Robert Martin, Terry Page, Donna Phillips, Lynn Farbman, Stephanie Balsanti, Kathleen Sutcliffe, Paul DiGiacoma, Leroy Jacobs, Idowu Adeniren, Paul Amarando, and Jerry Valencia.
[3] Although we recognize that the panel in Abdallah found the proofs concerning the vocational functions of the defendant, an occupational center, insufficient to warrant protection under the Act, Abdallah is distinguishable. The defendant there, unlike Bancroft, functioned "as a combination of employment agency and sheltered workshop with a component of vocational counseling to determine employability and potential job performance." Abdallah, supra, 351 N.J.Super. at 287, 798 A.2d 131. Bancroft is not an employment agency. It provides a more comprehensive range of services in vocational and life skills instruction than the panel's opinion suggested as to the defendant in Abdallah. We also note that the panel in Abdallah allowed the defendant to present "a fuller picture" of its functions on remand, in a further attempt to establish its entitlement to immunity. Id. at 287 n. 3, 288, 798 A.2d 131. By contrast, the record here is sufficiently developed to sustain Bancroft's immunity.