**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3060-15T3

S.B.K. (formerly R.B.),
an infant by his Guardian
Ad Litem, BARBARA KLEIN,

    Plaintiff-Appellant

v.

HARVEST OF HOPE,

    Defendant-Respondent,

and

THE STATE OF NEW JERSEY DIVISION
OF YOUTH AND FAMILY SERVICES ("DYFS"),
STATE OF NEW JERSEY DEPARTMENT OF
CHILDREN AND FAMILIES CASE MANAGER
WORKER DIANE SMITH, in her official
and personal capacity, CASEWORKER M.
OLMO, in his/her official and personal
capacity, CASEWORKER CURTIS CARTER,
in his official and personal capacity,
CASEWORKER CURTIS CARTER, in his official
and personal capacity, CASEWORKER LISA
MARIE FINNEGAN, in her official and
personal capacity CASEWORKER M. BAENA,
in his/her official and personal capacity,
SUPERVISOR B. BLAKELY, in his/her official
and personal capacity, SUPERVISOR JOE
GORMAN, in his official and personal
capacity, SUPERVISOR H. TORRES-MEJIAS,
in his/her official and personal capacity,
GLADYS WITT, NICK JONES, CLAUDIA S.,

SHARON S. and GLADYS H.,

    Defendants.

_____

Argued November 1, 2017 — Decided August 14, 2018

Before Judges Fuentes, Manahan and Suter.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-8102-11.

Brian A. Heyesey argued the cause for appellant (Szaferman, Lakind, Blumstein & Blader, PC, attorneys; Janine G. Bauer, of counsel and on the brief; Brian A. Heyesey, on the brief).

Anthony P. Pasquarelli argued the cause for respondent (Sweet Pasquarelli, PC, attorneys; Anthony P. Pasquarelli, of counsel; Kenneth C. Ho, on the brief).

PER CURIAM

On October 5, 2011, twelve-year-old plaintiff S.B.K.,[1] through his mother and guardian ad litem Barbara Klein, filed a multi-count civil action against defendants alleging he suffered physical and psychological harm when he was placed in the physical custody and care of these defendants. On March 11, 2016, the Law Division entered judgment approving the settlement of plaintiff's claims against all defendants, except the Harvest of Hope Family

---

[1] We use initials and pseudonyms where appropriate to protect the minor's privacy and to preserve the confidentiality of records related to Family Part matters. R. 1:38-3(d).

Services Network, Inc. (Harvest of Hope). On November 19, 2014, Harvest of Hope moved for summary judgment, arguing it was entitled to immunity under the Charitable Immunity Act (CIA), N.J.S.A. 2A:53A-7 to -11. On January 23, 2015, the court heard oral argument from counsel, granted defendant's summary judgment motion and dismissed plaintiff's cause of action with prejudice.

In this appeal, plaintiff argues the motion judge erred in finding Harvest of Hope is entitled to the protections afforded to charitable entities under the CIA. We agree and reverse. After reviewing the record developed before the Law Division, we conclude the motion judge improperly determined that Harvest of Hope was organized exclusively for charitable purposes without analyzing its source of funds or accurately determining whether it relieves the State of a burden it would otherwise have to perform.

In order to properly analyze the legal issues raised by the parties, we must first provide a brief historical context to the discussion.

I

On May 3, 1999, the Legislature enacted the Fost-Adopt Demonstration Program for Boarder Babies and Children (Fost-Adopt Demonstration Program). The program reflected the Legislature's recognition of New Jersey's "serious problem" concerning "infants and young children living in hospitals beyond medical necessity,"

3                                          A-3060-15T3

i.e., "boarder babies". The Legislature recognized the need to "immediately address this serious problem and ensure that . . . 'boarder babies' and 'boarder children' in our State's hospitals are appropriately placed in homes as quickly as possible so . . . they can receive the care and nurturing that all infants and young children need . . . ." As part of the program, the Legislature charged the Director of the Division of Youth and Family Services" or "DYFS"[2] (Division) with the following tasks:

> [(1)] Development of fost-adopt families from already approved foster or adoptive homes or [homes] recruited specifically for this program;
>
> [(2)] Commitment by a fost-adopt family to accept an infant or child on a foster care basis but agree to adopt the infant or child if the infant or child becomes available for adoption;
>
> [(3)] Establishment of criteria to determine which infants and children can be placed in fost-adopt homes;
>
> [(4)] Provision of intensified services to the biological parent[s] to effect family reunification;
>
> [(5)] Provision of intensive services to the adoptive parents; and
>
> [(6)] Development of concurrence within the legal community, including family court

---

[2] Effective June 29, 2012, the Division of Youth and Family Services is now known as the Division of Child Protection and Permanency. See L.A. v. N.J. Div. of Youth and Family Servs., 217 N.J. 311, 318 n.1 (2014).

judges, law guardians[,] and deputy attorney generals regarding aggressive, time-limited permanency planning which would lead to guardianship litigation and adoption finalization.

As part of its implementation of the Fost-Adopt Demonstration Program, the Division met with representatives of the First Baptist Community Development Corporation (FBCDC), a nonprofit organization dedicated to improving the community surrounding the First Baptist Church of Lincoln Gardens in Somerset, New Jersey. As a result of these discussions, the FBCDC submitted a contract proposal dated March 25, 1998. The goal of the proposal was for FBCDC to stabilize families and revitalize the community between New Brunswick and Franklin Township.

Section 2.2 of the proposal was entitled "The Harvest of Hope Foster Care Initiative." In this section, the FBCDC explained that it created the Harvest of Hope "Program" to assist the Division in addressing Essex County's boarder baby crisis. The FBCDC described the Harvest of Hope Program as a "Christian Family Services Network." Its "approach" would be "to identify foster parents through networking with churches in the [S]tate of New Jersey." At the time of the proposal, the FBCDC had contacted forty-one churches, nine of whom agreed to join the Harvest of Hope Program's network.

In different sections and subsections throughout the proposal, the FBCDC identified the following as the Harvest of Hope Program's "objectives[,]" "initiatives[,]" and "goals":

> 4.21 Eliminate the "boarder baby" problem within the State of New Jersey through the provision of temporary foster homes supported through a statewide church based network[;]
>
> 4.22 Increase the availability of Foster Homes for infants and their siblings through diligent recruitment, training[,] and a timely approval process[;]
>
> 4.23 Process [twenty-five] new infant/sibling inquiries per month received from [the Division][;]
>
> 4.24 Provide train-the-trainer instruction for people interested in training in the areas of foster care, infant care, and volunteer support[;]
>
> 4.25 Expedite placement of babies into permanent homes using effective planning and networking[;]
>
> . . . .
>
> 4.31 Organize, train[,] and manage a coordinated voluntary network as a church based resource for recruitment, assessment, training[,] and approval of Foster Homes[;]
>
> 4.32 Assist [the Division] in the handling of inquiries;
>
> 4.33 Assist [the Division] in the training, home study[,] and approval process of foster homes[;]

4.34 Effect the retention of recruited Foster Homes by providing a viable and nurturing family support system[;]

4.35 Maintain continuity with [Division] policies, practices[,] and support through designated liaison functions and [Division] personnel assigned to work with and through this program[;]

. . . .

Incorporat[e] programs and networks that support the infant while [the Division] attempts to provide a plan of action for the infant prior to birth[;]

Establish[] a rapport with the [Division] caseworker and the mother that has been identified by [the Division] as having an active file and is in need of outreach services and support[;]

Focus[] on preventive measures and diversion of families and newborns away from the child protective system[;]

Develop[] . . . new foster care resources[;]

Improv[e] the coordination and interagency collaboration and home-based peer services without the use of extended residential services[;]

Lessen[] the number of infants in the Essex County area who, after birth, become boarder babies[;]

. . . .

Recruit and train candidate foster families so as to secure [forty] approved, nurturing[,]

A-3060-15T3

and professionally trained Foster homes over a twelve-month time period . . . [;][3]

. . . .

Process [twenty-five] inquiries from [the Division] each month during calendar year 1998[;]

Facilitate a [ninety-percent] acceptance rate of placement in a [Division] approved home within one month of approval[;]

Achieve a[n] [eighty-percent] program retention rate for [thirty] homes approved during the contract year[;]

. . . .

Expand Christian Family Network to include [twelve] additional churches[;]

. . . .

Conduct monthly Orientation and Training sessions for Foster parents and volunteers[;]

. . . .

Establish a formal Foster Family Retention Program aimed at achieving a [seventy-five percent] program retention rate[;]

. . . .

Conduct a minimum of [two] recruitment events each month in 1998.

---

[3] The contract proposal states that "[t]hese homes will be approved by [the Division] as [Division] foster homes and will be invited to become participating members of the Harvest of Hope Christian Family Services Network."

According to the FBCDC, through these objectives, the Harvest of Hope Program would "work[] diligently with [the Division] to place . . . infants into loving, Christian homes." The FBCDC identified its Christian approach to family stabilization as one of its ten "success factors."

The proposed contract required the Division to assign two "Liaison Specialist[s]" to provide the FBCDC with "technical assistance" regarding foster home approvals and placements. All referrals to foster homes recruited by the Harvest of Hope Program would be submitted through one or both of these Division liaisons. Ultimately, all foster homes would be "approved by [the Division]" and would be "subject to [Division] re-evaluation procedures."

The FBCDC's Harvest of Hope Program was incorporated as an independent nonprofit organization on December 29, 2000. As of that date, the organization's official name is "Harvest of Hope Family Services Network, Inc." The appellate record contains a "Standard Language Title XX Purchase of Service Contract" purportedly entered into by Harvest of Hope and the Division. However, it is unclear whether the parties formally agreed to the terms stated therein. Harvest of Hope's objectives under this contract are nearly identical to those described in the FBCDC's March 25, 1998 contract proposal. Harvest of Hope agreed to assign

an outreach representative to conduct monthly visits/inspections of each foster parent in its network.

According to its tax returns, Harvest of Hope received $882,552 in total revenue during the 2001 tax-year. The State of New Jersey provided $835,797 of this funding. Harvest of Hope described the remaining $46,755 as "[d]irect public support[.]" The record reveals, however, that $43,051 of Harvest of Hope's "[d]irect public support" was actually provided by the FBCDC as a "[p]rogram [s]ervice [e]xpense." The ostensible private "charitable contributions" amounted to approximately 0.4 percent of Harvest of Hope's total revenue for the 2001 tax-year.

Harvest of Hope's 2002 tax return reveals a similar trend. In 2002, Harvest of Hope received $1,099,683 in total revenue. It reported that $1,095,758 of these funds came from the State of New Jersey, and $3,925 came from "[d]irect public support[.]" Accordingly, private charitable contributions amounted to approximately 0.3 percent of Harvest of Hope's total revenue for the 2002 tax-year.

II

Plaintiff S.B.K. was born prematurely at St. Elizabeth Hospital the same year the Legislature established the Fost-Adopt Demonstration Program. Both plaintiff and his biological mother S.B. tested positive for cocaine immediately following plaintiff's

10

birth. Plaintiff was treated for Respiratory Distress Syndrome, neonatal anemia, upper lobe pneumonia, sepsis, and atopic dermatitis. As required by N.J.S.A. 9:6-8.10, a social worker at the Hospital reported the infant's addiction to the Division. A summary report of the Division's investigation shows plaintiff's biological mother had been previously hospitalized "due to a domestic violence situation."

At the time of plaintiff's birth, S.B. had four other children, all of whom resided in North Carolina. One of the children was in foster care; the three others had been placed with relatives. S.B. identified R.F. as plaintiff's biological father. This was subsequently confirmed in a paternity test. Division caseworker Mariela Baena recommended that the Division "establish supervision" of plaintiff. Shortly thereafter, the Division filed an Order to Show Cause (OTSC) and Verified Complaint in the Family Part seeking physical and legal custody of plaintiff. The court granted the Division's OTSC and set the matter down for a hearing on May 20, 1999.

On June 25, 1999, plaintiff was discharged from St. Elizabeth Hospital and placed "in a Harvest Hope . . . foster home with [defendant,] Gladys [Witt]." The Division's Bureau of Licensing approved Witt as a foster parent and issued her a Certificate of Approval on June 22, 1999. Witt's approval as a foster parent by

11

the Division was based on her compliance with Harvest of Hope's training modules, the FBCDC's investigatory requirements, and a home inspection conducted by FBCDC Outreach Specialist Debra Reina.

In a letter dated June 6, 2000, the Division's Supervisor for the Foster Home Certification Program informed Witt:

> A recent inspection of your home by a Foster Home Inspector from the Bureau of Licensing demonstrates that you are in compliance with the Manual of Requirements. As such, the Bureau is enclosing a Certificate of Approval, which authorizes you to operate as a foster home until the expiration date specified on the Certificate. [6/24/01] The Foster Home Inspector will contact you to make an appointment for an annual monitoring visit in one year.

The appellate record contains an undated report filed and signed by Division Liaison Donna Bailey concerning Witt's suitability to operate a foster home. A section of the report is titled: "Support needed by the applicant to assist them in parenting a child[.]" Immediately below this section, Bailey wrote: "This family has the support of the [Harvest of Hope] staff, who will maintain monthly contact with the family via home visits and special program events." On August 16, 2001, the Family Part terminated plaintiff's biological parents' parental rights and placed plaintiff under the Division's guardianship and control.

Section 5.3 of the March 25, 1998 contract proposal required Harvest of Hope to "conduct monthly visitation to [Witt's] foster home to identify any unmet needs and ensure that sufficient support [was] being provided." Outreach Specialist Patiya Freely did not make contact with plaintiff or Witt until October 5, 2001, approximately seven weeks after the Family Part's Guardianship Order. On this date, Freely noted in her Contact Sheet a "pest infestation" in Witt's apartment. Freely also wrote: "may request an inspection of [the] home."

Additional entries in her Contact Sheet documented Freely's failure to gain access into Witt's apartment to make an in-person assessment of its condition. Freely's handwritten entries show she was unable to enter the apartment in November 2001; January 2002; February 2002; and March 2002. In a December 2001 entry, Freely noted that she was able to reach Witt on the telephone. Freely wrote: "Ms. Witt stated she has been hospitalized 1 1/2 weeks & the FC [(foster children)] were with her mother." On January 31, 2002, Freely sent Witt the following letter:

> Dear Ms. Witt,
>
> My name is Patiya Freely. As you may already know, I am your Retention Specialist from Harvest of Hope at the East Orange office. A review of our records shows that we have not been able to contact you recently. As an ongoing commitment to our past and current Harvest of Hope families, we would like to

13

> periodically be in touch with you. Please
> contact me upon receipt of this letter so that
> we can update our records and assess if
> Harvest of Hope can be [of] any assistance or
> support to your family.

However, the appellate record does not contain any evidence that Freely made any attempt to notify the Division of her repeated failures to make in-person contact with Witt or of Witt's health condition. In an Institutional Abuse Investigation report dated March 25, 2002, Division Case Practice Specialist Gail Miranda stated:

> [I]t is the expectation and policy that the
> Harvest of Hope caseworker makes monthly in-
> person contact with the foster parent and
> children in the home. If the foster parent
> is not cooperating and [cannot] be contacted,
> Harvest of Hope is supposed to notify the
> Metro Regional Foster Care [O]ffice
> immediately.
>
> . . . .
>
> [I]t is also the expectation that the foster
> parent is suppose[d] to contact the [various]
> case managers [and inform them] of any
> hospitalization or medical concerns.

An Inter-Office Communication dated September 9, 2002 between the Division's Regional Supervisor of the Metropolitan Institutional Abuse Unit and its Regional Support Supervisor of the Metro Foster Care Operations documents the extent of the injuries suffered by plaintiff from Witt's neglect and the horrific, unsanitary conditions of her apartment:

14                                              A-3060-15T3

> [Plaintiff] sustained a parasitic infection (Scabies)[4] as a result of this incident. Ms. Witt's actions were unjustified/inappropriate in terms of maintaining an unsafe and unsanitary environment. Ms. Witt's actions placed [plaintiff] at unnecessary undue serious risk of serious harm.
>
> . . . .
>
> The condition of the home was deplorable. The clutter in the home prevented entrance into the bedrooms. There was debris all over the floor, the children's bunk bed was broke, the crib in the home was filled with debris and there were bottles of brandy observed in the baby stroller. The hallway of the home also smelled of dog feces.
>
> . . . .
>
> On March 21, 2002, Ms. Witt attempted to deceive the Division representative by identifying herself as another individual and attempting to prevent the Division's staff from gaining entrance into the home. During the months of November 2001 and February 2002, Division case managers made several attempts to contact Ms. Witt, who failed to cooperate with visitations requirements.

These deplorable conditions were corroborated by Witt's landlord. Division case workers gained entry into her apartment with the assistance of the Irvington Police Department. Plaintiff was three years old at the time.

---

4 The pediatrician who examined plaintiff described scabies as "microscopic spiders that bite or deposit their feces." The doctor also explained that scabies is a "contagious parasitic infection that results from an unsanitary environment."

At one point, the Division discovered that Witt suffered from kidney disease and required dialysis treatments three times per week. She claimed that the hospital staff supervised plaintiff while she received dialysis; she alleged that her sister had taken care of the child during her two periods of hospitalization. When asked why she did not contact the Division for assistance, Witt claimed to be unaware of this option. She also said she "did not want anyone in her home."

The Division removed plaintiff from Witt's home on March 21, 2002.[5] The Division's Bureau of Licensing closed Witt's foster home shortly before her death in May 2002. The Division later substantiated Witt for neglect in accordance with N.J.S.A. 9:6-8.21.

Harvest of Hope Outreach Specialist Patiya Freely was the individual assigned to inspect Witt's foster home. When she was interviewed by the staff of the Division's Institution Abuse Investigation Unit on March 22, 2002, Freely "reported that she was not aware of Ms. Witt being that ill." Freely alleged that Witt's home was "not dirty but she did see roaches." Freely also alleged that Witt never told Harvest of Hope about the extent of her illness.

---

[5] The Division took custody of the three other children who were also residing in this apartment.

Plaintiff, acting through his guardian ad litem, alleges that Harvest of Hope and their individually named agents and employees negligently, recklessly or willfully failed to carry out their responsibilities to monitor the conditions in Witt's residence from June 25, 1999 until March 21, 2002. Defendants' failure to supervise Witt led to plaintiff's "abuse, maltreatment[,] and neglect." Among plaintiff's causes of action, he alleges Harvest of Hope's failure to properly monitor, supervise, and inspect his foster placement violated his substantive due process rights under the New Jersey Constitution, as well as various relevant provisions in Title Nine and Title Thirty. He seeks compensatory and punitive damages.

Harvest Hope moved for summary judgment based on the immunity provided to charitable organizations under N.J.S.A. 2A:53A-7. Harvest of Hope argued before the Law Division that it was "a nonprofit corporation organized exclusively for charitable and educational purposes." Harvest Hope also submitted a reply brief claiming, for the first time, it was formed for religious purposes.

In the course of oral argument before the motion judge, counsel for Harvest of Hope abandoned the position that it was formed for educational purposes, conceding that plaintiff did not benefit directly from defendant's training of potential foster

parents. Despite this concession, the motion judge granted defendant's motion for summary judgment and dismissed plaintiff's complaint with prejudice. The judge made the following comments in support of his ruling:

> I'm going to leave the interpretations to counsel, the Appellate Division, or anyone else who will review the record. My reviewing of the case law as it relates to [Parker v. St. Stephen's Urban Dev. Corp., Inc., 243 N.J. Super. 317 (App. Div. 1990)] and the comments by Justice Long are [inapposite to] this particular case. There is no fact in this particular case that would indicate that [Harvest of Hope] gave up [its] charitable status as defined by the law.
>
> In this particular case, all the functions performed by [the Division] were continuously performed by [the Division]. Those functions performed by [Harvest of Hope] were not mandated government functions. . . . I do not find under this particular provision that [Harvest of Hope] lost [its] charitable status. All other elements of the immunity have been met. The child was a beneficiary of the placement of [Harvest of Hope]; that's a benefit. And, it is a nonprofit corporation designed under the statute. The motion is granted for summary judgment to [Harvest of Hope].

This court reviews a summary judgment ruling de novo, applying the same standard that governs the trial courts. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (citation omitted). A court should grant summary judgment when "there is no genuine issue as to any material fact

challenged" and the moving party is "entitled to . . . judgment or order as a matter of law." R. 4:46-2(c). In determining whether a genuine issue of material fact exists, this court considers "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, . . . are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

New Jersey first recognized the doctrine of charitable immunity in D'Amato v. Orange Mem'l Hosp., 101 N.J.L. 61 (E. & A. 1925). Its original purpose was to "avoid diverting charitable trust funds to non-charitable purposes in order to live up to the reasonable expectations of the benefactor." Parker, 243 N.J. Super. at 321. As our Supreme Court later stated, "it would be contrary to the interests of society that funds dedicated to a charitable use be permitted to be diverted or diminished by the payment of judgments . . . where suit is instituted by the beneficiary of the charity." Jones v. St. Mary's Roman Catholic Church, 7 N.J. 533, 537 (1951).[6]

---

[6] Over time, the Court recognized several additional rationales underlying the charitable immunity doctrine, including: (1) preservation of charitable organizations and their funds; (2) encouragement of private philanthropy; and (3) alleviation of the government's burden to provide "beneficent services." Tonelli v.

In 1958, the Court abolished charitable immunity in a trilogy of cases that reconsidered the doctrine's merit from an injured plaintiff's perspective. See Benton v. YMCA, 27 N.J. 67 (1958); Collopy v. Newark Eye & Ear Infirmary, 27 N.J. 29 (1958); Dalton v. St. Luke's Catholic Church, 27 N.J. 22 (1958). The Court reasoned that the doctrine "[ran] counter to widespread principles which fairly impose liability on those who wrongfully and negligently injure others[.]" Collopy, 27 N.J. at 47.

The Legislature responded by enacting the CIA, which "reinstat[ed] 'the common law doctrine as it had been judicially defined by the courts of this State.'" O'Connell v. State, 171 N.J. 484, 489 (2002) (quotation omitted); see also Kuchera v. Jersey Shore Family Health Ctr., 221 N.J. 239, 247 (2015); Bieker v. Cmty. House of Moorestown, 169 N.J. 167, 174 (2001). In pertinent part, N.J.S.A. 2A:53A-7 provides as follows:

> No nonprofit corporation, society or association <u>organized exclusively for religious, charitable or educational purposes</u> or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a

Bd. of Educ., 185 N.J. 438, 443 (2005) (citations omitted); see also Estate of Komninos v. Bancroft Neurohealth, Inc., 417 N.J. Super. 309, 319 (App. Div. 2010); Abdallah v. Occupational Ctr. of Hudson Cty., Inc., 351 N.J. Super. 280, 284 (App. Div. 2002).

beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association.

. . . .

Nothing in this section shall be deemed to grant immunity to: (1) any trustee, director, officer, employee, agent, servant or volunteer causing damage by a willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature[.]

[N.J.S.A. 2A:53A-7 (emphasis added).]

Thus, in order for charitable immunity to apply, a defendant entity must show: "(1) [it] was formed for nonprofit purposes; (2) [it] was organized exclusively for religious, charitable, or educational purposes; and (3) [it] was promoting such purposes at the time of the injury" in question, and the plaintiff was a "beneficiary" of such purposes. Tonelli, 185 N.J. at 444—45 (quoting Hamel v. State, 321 N.J. Super. 67, 72 (App. Div. 1999)). Because charitable immunity is an affirmative defense, Kain, 436 N.J. Super. at 479, the entity asserting its applicability bears the burden of persuasion. Abdallah, 351 N.J. Super. at 288.

A judicial determination that an entity devotes itself to a covered purpose depends on the facts and circumstances of each case. Estate of Komninos, 417 N.J. Super. at 319 (first citing Bieker, 169 N.J. at 175; then citing Presbyterian Homes of Synod v. Div. of Tax Appeals, 55 N.J. 275, 284 (1970)); see also Kuchera, 221 N.J. at 252 (citation omitted) ("Whether a nonprofit entity, whose certificate of incorporation and by-laws provide that it is organized exclusively for charitable, religious, educational, or hospital purposes, actually conducts its affairs consistent with its stated purpose often requires a fact-sensitive inquiry."); Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 345 (2003) (explaining a fact-sensitive approach is "in line" with the Supreme Court's prior treatment of charitable immunity).

An entity that proves it is organized exclusively for educational or religious purposes automatically satisfies the second prong of the statutory standard codified in N.J.S.A. 2A:53A-7(a). Estate of Komninos, 417 N.J. Super. at 320. By contrast, an entity seeking to prove it is organized for charitable purposes must satisfy a further factual analysis, which, as described below, includes a mandatory "source of funds" assessment. Ryan, 175 N.J. at 346. Finally, N.J.S.A. 2A:53A-10 provides that the CIA is

remedial in nature, and it shall be "liberally construed" in order to effectuate its purposes.[7]

Here, plaintiff does not dispute that defendant was formed for nonprofit purposes. Nor does he dispute that he was the intended beneficiary of defendant's purported services at the time he was injured. Our analysis focuses solely on whether Harvest of Hope is organized for religious, charitable, or educational purposes in accordance with N.J.S.A. 2A:53A-7(a), and if so, whether Harvest of Hope's agents or employees acted with gross negligence in accordance with N.J.S.A. 2A:53A-7(c).

An entity's nonprofit status is not dispositive of whether it is organized for charitable purposes. Parker, 243 N.J. Super. at 324. Similarly, the fact that an entity performs a useful service does not necessarily means the entity engages in charitable activity. See, e.g., Ryan, 175 N.J. at 344. What is required is "an examination of the entity seeking to clothe itself in the veil of charitable immunity to discover its aims, its origins, and its method of operation in order to determine whether its dominant motive is charity or some other form of enterprise." Parker, 243 N.J. Super. at 325.

---

[7] Courts in this State have similarly recognized that the CIA's underlying public policy compels its liberal construction. See, e.g., P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 148 (2008).

A-3060-15T3

To demonstrate a charitable purpose, a nonprofit entity must show that its actions relieve the government of a burden it would otherwise have to perform. Id. at 325—26. Additionally, although a "percentage figure" does not "rigidly dictate the analysis[,]" Estate of Komninos, 417 N.J. Super. at 324—25, a non-religious, non-educational organization seeking to apply N.J.S.A. 2A:53A-7 must show some level of support from private donations and/or trust funds. Bieker, 169 N.J. at 178. A reviewing court considers the entity's "source of funds as a critical element" of its analysis. Abdallah, 351 N.J. Super. at 284, 287—88.

In Tonelli, the Court reaffirmed that charitable immunity has "no applicability to a governmental entity funded exclusively by the public and rendering services to which citizens are entitled as a matter of right." Tonelli, 185 N.J. at 440—41. Similarly, the Court refused to extend the protections afforded by N.J.S.A. 2A:53A-7 to an entity acting as an instrumentality of the government. Id. at 450.

To be clear, a nonprofit entity does not automatically alter its status under the CIA when it receives public funds in any amount. O'Connell, 171 N.J. at 495. In fact, we have held that a nonprofit entity funded primarily through charitable donations will not sacrifice its immune status by accepting "some" government support. See Parker, 243 N.J. Super. at 327—28; see also Morales

24                                                A-3060-15T3

v. N.J. Acad. of Aquatic Sci., 302 N.J. Super. 50, 55 (App. Div. 1997) ("[T]he acceptance of government funds and some measure of government control does not transform a private nonprofit corporation into a governmental instrumentality."). The same is true with respect to fundraising and profit-seeking endeavors. Stated differently, "[a] qualifying organization does not lose its statutory immunity merely because it charges money for its services, unless it makes a profit or collects fees for services totally unrelated to its organizational pursuits." Graber, 313 N.J. Super. at 482 (citations omitted).

Here, private charitable contributions accounted for approximately 0.4 percent of Harvest of Hope's revenue for the 2001 tax-year, and 0.3 percent of the revenue for the 2002 tax-year. During the same time periods, the State of New Jersey provided Harvest of Hope with 94.7 percent and 99.6 percent of its total revenue, respectively. Given this undisputed evidence, the motion judge erred in concluding that Harvest of Hope was organized exclusively for charitable purposes. In fact, it is clear that the motion judge did not consider Harvest of Hope's "source of funds," as required by Ryan, 175 N.J. at 346, and Abdallah, 351 N.J. Super. at 284.

Furthermore, nothing in the record suggests that Harvest of Hope's actions relieved the State of a burden it would otherwise

have to perform, as required by Parker, 243 N.J. Super. at 325—26. Despite Harvest of Hope's contractual obligation to "conduct monthly visitation" of Witt's foster home, the Division remained obligated under N.J.S.A. 30:4C-25 to "regularly visit all children under its care, custody, or guardianship[,]" and to assure plaintiff "the maximum benefit from [its] services." It is clear that Harvest of Hope "was not created to lessen the burden on government but to obtain as much funding from the government as possible and to operate [its program] [almost] exclusively with that funding." Parker, 243 N.J. Super. at 326.

The record is clear that Harvest of Hope is not entitled to charitable immunity under the CIA. We thus reverse the order of the Law Division granting Harvest of Hope summary judgment and dismissing plaintiff's complaint with prejudice, and remand this matter for trial.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3060-15T3